# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **O'CONNOR,** *et al.*, | Case No. 3:11-cv-1297-SI |
| Plaintiffs, | |
| v. | **OPINION AND ORDER** |
| **COUNTY OF CLACKAMAS,** *et al.*, | |
| Defendants. | |

Mark E. Griffin, Griffin & McCandlish, 1631 Northeast Broadway, No. 721, Portland, Oregon 97232. Attorneys for Plaintiffs.

Stephen L. Madkour, County Counsel, Scott C. Ciecko, Assistant County Counsel, Alexander Gordon, Assistant County Counsel, Clackamas County, Oregon, 2051 Kaen Road, Oregon City, Oregon 97045-1819.   Attorneys for Defendants Clackamas County, Steve Hanschka, and Kim Benthin.

Daniel J. Rohlf, Pacific Environmental Advocacy Center, 10015 Southwest Terwilliger Blvd., Portland, Oregon 97219-7768. Attorneys for Defendant Donald Mench.

**Michael H. Simon, District Judge.**

Plaintiffs Kip O'Connor, Lisa Konell, and Big Mountain Excavation Co. ("Big Mountain") (collectively, "Plaintiffs")[1] bring this action under 42 U.S.C. § 1983, alleging violations of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution. Plaintiffs are a construction company and two property owners and developers.

Defendants include Clackamas County ("Clackamas County" or "County") and two County employees, Steve Hanschka ("Hanschka") and Kimberly Benthin ("Benthin"). Hanschka is the Clackamas County Floodplain Manager, and Benthin is a Code Compliance Specialist who works for the County Department of Transportation and Planning. Hanschka and Benthin are sued in both their individual and professional capacities. Collectively, the County, Hanschka, and Benthin are referred to as the "Clackamas County Defendants." Plaintiffs also assert claims against Defendant Donald Mench ("Mench"), in his personal capacity.[2] Mench is the volunteer Chair of the Mount Hood Corridor Community Planning Organization ("MHCCPO"), a local land use advisory committee.

Plaintiffs assert one claim alleging violations of their substantive due process rights, one claim alleging violations of their procedural due process rights, and one claim alleging First Amendment retaliation. The Clackamas County Defendants and Defendant Mench separately

---

[1] During the relevant time period, certain properties at issue were owned by Konell and other properties were owned by Lifestyle Ventures, LLC ("Lifestyle"), an entity owned at various times in whole or in part by O'Connor but not a party to this lawsuit. Certain actions of Defendants relate to O'Connor, Lifestyle, or Konell. For purposes of this Opinion, when discussing the ownership of a property or an individual or entity against whom an action was allegedly taken by Defendants, the Court generally references "Plaintiffs," meaning O'Connor, Lifestyle, and Konell, singularly or together in any combination, notwithstanding the fact that Lifestyle is not a party. Doing so does not affect any issue material to the outcome of the pending motions.

[2] The Court previously dismissed other named defendants, and Plaintiff voluntarily dismissed claims against certain defendants. Dkts. 66, 79, and 82.

move for summary judgment on all of Plaintiffs' claims. Dkts. 87 and 91. As discussed further below, Defendants' motions are granted.

Plaintiffs allege that their constitutional due process rights were violated with respect to three related parcels of real property. For the three parcels combined, Plaintiffs allege that they have a constitutionally protected property interest in a permit required for a revetment wall Plaintiffs constructed along the Sandy River on those parcels and that Defendants violated Plaintiffs' rights relating to these properties by, among other things, denying the permit required for the revetment. For one of the three parcels, separately, Plaintiffs allege that they have a constitutionally protected property interest in the right to develop a single family residence on the property because the elevation of the portion of the lot on which the proposed house will be located is above a particular flooding level, and thus does not require a special flood development permit. Plaintiffs allege that Defendants violated Plaintiffs' rights relating to this property by, among other things, unnecessarily requiring a special flood permit and denying that permit, which prevents Plaintiffs from being able to build a single family residence on the property. Defendants' motions are granted with respect to these claims because Plaintiffs fail to establish a genuine issue of fact that they have a constitutionally protected property interest in the development permits for these properties.

Plaintiffs also allege that their constitutional due process rights were violated with respect to a fourth, unrelated parcel of real property. Plaintiffs allege that they have a constitutionally protected property interest in the full use and enjoyment of this parcel and that Defendants violated Plaintiffs' rights relating to this property by issuing two allegedly meritless code violations relating to the property. Plaintiffs received notice of the code violations, received a hearing on the first violation, at which Plaintiffs prevailed, and the second violation was then

PAGE 3 – OPINION AND ORDER

dismissed. Defendants' motions are granted with respect to the alleged procedural due process violations on this property because Plaintiffs received notice and a meaningful opportunity to be heard, and with respect to the alleged substantive due process violations because Plaintiffs fail to establish a material issue that they were denied the full use and benefit of the property, that the two code violations failed to advance any legitimate government interest, and that the County's issuance of the two code violations rose to the level of egregious official conduct.

Defendant Mench is granted summary judgment on Plaintiffs' due process claims on the additional and independent ground that Plaintiffs fail to establish a genuine issue that Mench was acting as a state actor during the relevant time period.

Plaintiffs also allege that the Clackamas County Defendants made decisions that adversely affected Plaintiffs, including issuing meritless code violation citations to Plaintiffs and Plaintiffs' customers, requiring an unnecessary permit, and denying that permit, in retaliation for Plaintiffs' exercise of their First Amendment rights. The Clackamas County Defendants are granted summary judgment with respect to this claim because Plaintiffs fail to establish a genuine dispute as to whether the alleged protected conduct was the requisite cause of the alleged adverse actions.

## STANDARDS

A party is entitled to summary judgment if the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The court must view the evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. *Clicks Billiards Inc. v. Sixshooters Inc.*, 251 F.3d 1252, 1257 (9th Cir. 2001). Although "[c]redibility determinations, the weighing of the evidence, and the drawing of

PAGE 4 – OPINION AND ORDER

legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment," the "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient. . . . " *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 255 (1986). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotations and citation omitted).

## BACKGROUND[3]

### A.  The Parties and the Real Properties Involved

O'Connor is the sole owner of Big Mountain and is now the sole member of Lifestyle. During the relevant time period, O'Connor was a minority member of Lifestyle. Lifestyle is not a party in this lawsuit. In May 2007, O'Connor purchased three real property lots, Lots 4200, 4300, and 4400, on Relton Lane in Rhododendron, Oregon (collectively, "the Relton Lane Lots"), in Clackamas County. He then transferred Lots 4200 and 4300 to Lifestyle and Lot 4400 to Konell. Third. Am. Compl. ¶ 9. At all times material to this lawsuit, only Lifestyle or Konell owned the Relton Lane Lots. *Id.*

The eastern boundary of the Relton Lane Lots is the Sandy River. The Relton Lane Lots are located within the Sandy/Salmon River Principal River Conservation Area ("PRCA"), a zone with special development rules. Third Am. Compl. ¶ 11. The Relton Lane Lots are also located within a regulated floodplain, and as such are regulated under Section 703 of the Clackamas County Zoning and Development Ordinance ("ZDO"). *Id.* ¶ 12.

---

[3] Where background facts were alleged by Plaintiffs in the Third Amended Complaint and not disputed by Defendants with record evidence, the Court assumes them to be true for purposes of the pending motions.

During the relevant time period, Konell and O'Connor also owned property located at 27909 Salmon River Road in Welches, Oregon ("the Salmon River Road Property"), in Clackamas County. *Id.* ¶ 10. Plaintiffs had a permit to develop a single family residence on the Salmon River Road Property. *Id.* ¶ 26. It does not appear from the record that the Salmon River Road Property is in either a regulated floodplain or the PRCA.

Defendant Mench is retired; he has lived on Mt. Hood for more than 25 years. Declaration of Donald Mench ("Mench Decl.") ¶ 2. Dkt. 20. Mench's property abuts the Sandy River, and he is actively engaged in community affairs, including serving as a volunteer for a variety of non-profit and community service organizations. Mench Decl. ¶ 3. Mench has volunteered with MHCCPO for more than 25 years and served as a member or the Chair of MHCCPO's Land Use Committee for more than 15 years. Declaration of Daniel Rohlf ("Rohlf Decl.") Ex. C (Mench Depo Tr. 14:8-15:5). Dkt. 93-3. Community Planning Organizations ("CPOs") are part of Oregon's citizen involvement plan to "develop a citizen involvement program that insures the opportunity for citizens to be involved in all phases of the planning process." Oregon's Statewide Planning Goals & Guidelines, Goal 1: Citizen Involvement, Or. Admin. R. 660-015-0000(1), *available at* www.oregon.gov/LCD/docs/goals/goal1.pdf. As a member and Chair of MHCCPO' Land Use Committee, Mench coordinated communications with Clackamas County relating to land use decisions and encouraged County authorities to enforce relevant land use requirements where code or permit violations may exist. Mench Decl. ¶¶ 8, 10, 13.

**B. The Relevant Clackamas County Zoning and Development Ordinances**

Section 703 governs development in the Floodplain Management District ("FMD") (which Plaintiffs refer to as the "regulated floodplain"). A Floodplain Development Permit ("FDP") is required for any development in the FMD, subject to a few exceptions that do not

PAGE 6 – OPINION AND ORDER

apply in this case. ZDO 703.09. The FMD includes the Special Flood Hazard Area ("SFHA")

identified in the Flood Insurance Study for Clackamas County, Oregon & Incorporated Area,

with the accompanying Flood Insurance Rate Maps ("FIRMs"). ZDO 703.04. The Planning

Director has the authority to determine the boundaries of the SFHA. ZDO 703.04(B).

The SFHA includes areas known as the floodway, flood fringe, flood hazard, flood prone,

and shallow flooding areas. ZDO 703.05(LL). The floodway is the channel of the river "and the

adjacent land areas that must be reserved in order to discharge the base flood[4] without

cumulatively increasing the water surface elevation more than one foot" and is often referred to

as the "regulatory floodway." ZDO 703.05(U). Single family residences are not permitted to be

developed in the regulatory floodway. ZDO 703.07. The flood fringe is the portion of the SFHA

that is outside the floodway, for properties where base flood elevation ("BFE") data has been

provided and floodways have been established. ZDO 703.05(M).[5] A BFE is the computed

elevation to which floodwater is anticipated to rise during the base flood. ZDO 703.05(B). BFEs

are shown on the FIRMs and on the flood profiles included in the Flood Insurance Study. *Id*.

Section 704 of the ZDOs governs PRCA permits. Section 704 establishes standards for

river and stream setbacks, with certain exceptions. ZDO 704.04 and 704.05. Section 704 also

establishes height and visibility standards for development, ZDO 704.06, vegetation

preservation, ZDO 704.07, and application requirements, ZDO 704.08.

**C.  Plaintiffs' Development of the Relton Lane Lots**

Before purchasing the Relton Lane Lots, O'Connor spoke with Hanschka, who agreed

that the lots could be developed if an elevation certificate showed that the proposed development

---

[4] The base flood is the flood having a one percent chance of being equaled or exceeded in any given year, also known as the "100-year-flood." ZDO 703.05(A).

[5] The flood hazard, flood prone, and shallow flooding areas are not relevant to this case.

site was above the BFE. Declaration of Kip O'Connor ("O'Connor Decl.") ¶ 6. In a May 2010 email to his original business partner in Lifestyle discussing the Relton Lane Lots, O'Connor stated: "As far as regrets, please remember, when I proposed those lots, we were both on the same page when I explained at the time how they barely are buildable." Rohlf Decl. Ex. G at 2. Dkt. 93-7. The business partner responded, "While I understood that the lots were marginal, I did not realize that you were not working collaboratively and proactively with the county to resolve the land issues before spending my money and your time." *Id*. at 1.

In 2008, Plaintiffs began their development of the Relton Lane Lots, including installing utilities and culverts and improving Relton Lane with grading, filling, and shoulder stabilization with rock, all without a permit. Declaration of Mark E. Griffin ("Griffin Decl.") Ex. 8 at 2. Dkt. 125. After a County Code Compliance officer responded in late September 2008 to a complaint regarding the work being done on Relton Lane and County Staff documented the work with photographs in mid-October 2008, Plaintiffs eventually obtained a permit for the utility and road work on February 26, 2009, from the County Roads Department. *Id*. at 3. Plaintiffs did not, however, determine whether the improvements were allowable under the floodplain development regulations, and Plaintiffs did not obtain an FDP for the work. *Id*.

### 1. The rip-rap wall on the Relton Lane Lots

In January 2009, the Sandy River flooded, causing erosion on the Relton Lane Lots. Third Am. Compl. ¶ 14. In February 2009, O'Connor applied for emergency authorization from the Oregon Department of State Lands to construct a rip-rap wall (also referred to herein as the "revetment")[6] to protect the bank of the Sandy River and prevent further bank erosion. *Id*.;

---

[6] A rip-rap wall is a type of revetment. Revetments are "structures placed along the river bank to stabilize or protect the bank from erosion." *See* Revetment Definition, U.S. Army Corps of Engineers Applied River Engineering Center, available at http://mvs-wc.mvs.usace.army.mil/arec/Basics_Revetment.html. Revetments are generally constructed out

Griffin Decl. Ex. 4. Dkt. 115-3. O'Connor received the emergency authorization, which stated:

"In addition, you should contact your city or county planning office to be sure your project is in

compliance with local land use plans and programs." *Id.* Ex. 5, at 4. Dkt. 115-4. Rip-rap walls

require an FDP under the ZDOs. The ZDOs, however, provide:

> Work that is necessary to protect, repair, maintain, or replace
> existing structures, utility facilities, roadways, driveways, and
> stream banks in response to emergencies may be undertaken prior
> to obtaining an FDP, provided that an FDP is obtained after the
> emergency as passed.

ZDO 703.09. Plaintiffs had substantially completed the revetment as of approximately April 30,

2009. Plaintiffs did not apply for an FDP at that time or at any time during construction of the

revetment.

On July 13, 2009, the County received a complaint regarding Plaintiffs' revetment. Rohlf

Decl. Ex. F. at 3, ¶ 9. Dkt. 93-6. Although several months had passed since both the

"emergency" and the flood season had ended, Plaintiffs still had not submitted an application for

an FDP for the revetment.  On July 20, 2009, Benthin sent a notice to Plaintiffs that the

revetment may be a code violation, and Benthin requested that Plaintiffs contact the Clackamas

County Department of Transportation and Development. Griffin Decl. Ex. 17. Dkt. 115-13.

Benthin and O'Connor spoke by telephone July 29, 2009, and O'Connor agreed he would submit

the FDP and PRCA permit applications. Griffin Decl. Ex. 18. Dkt. 115-14. Benthin followed up

with a letter to Plaintiffs the next day, on July 30, 2009, notifying them that the revetment

violated ZDO Sections 703 and 704 and that FDP and PRCA permit applications must be

submitted by August 20, 2009. *Id.*

---

of stone, but may include other materials such as "concrete-mat, willow plantings, gabions," and
other materials. *Id.* At oral argument, Plaintiffs' counsel explained that the rip-rap wall in this
case was constructed out of stone, logs, and other natural material and that no concrete was used.

PAGE 9 – OPINION AND ORDER

## 2. Plaintiffs' FDP and PRCA permit applications and the County's request for a Letter of Map Amendment

On August 11, 2009, Plaintiffs submitted FDP and PRCA permit applications. Third Am. Compl. ¶ 22. After a permit application is submitted, the County has 30 days to notify the applicant if the permit is incomplete. Or. Rev. Stat. § 215.427(2). The applicant then has 180 days from the original application submission date to complete the application. Or. Rev. Stat. § 215.427(3)(a). If the applicant fails properly to respond to the notice of incomplete application by submitting (1) all of the missing information, (2) some of the missing information and a written statement that all relevant information has been provided, or (3) a written statement that no further information shall be submitted, within the allowed 180 days from the original submission, the application is void. Or. Rev. Stat. § 215.427(4).

Clackamas County timely issued two incomplete application notices to Plaintiffs, informing them that both the FDP and PRCA applications were considered incomplete. Griffin Decl. Exs. 19 & 21. Dkts. 115-15 &115-16. The application completion deadlines were February 7, 2010 for the PRCA permit and February 13, 2010 for the FDP.

On December 2, 2009, O'Connor delivered additional materials supporting Plaintiffs' FDP and PRCA permit applications to the County. O'Connor Decl. ¶ 22. The County promptly issued a Notice of Incomplete Application ("Notice") on the FDP application that was dated the next day, December 3, 2009. Griffin Decl. Ex. 24. Dkt. 115-18. On December 3, 2009, the County determined that the PRCA permit application was complete. Rohlf Decl. Ex. F at 8, ¶ 22.[7]

---

[7] On January 12, 2010, the County approved Plaintiff's PRCA permit for the single family residence on Tax Lot 4400, with the express condition that an FDP must be obtained because the entire property was in the regulated floodway. Griffin Decl. Ex. 9 at 2. Dkt. 115-6.

The Notice relating to the FDP application stated that the recently submitted materials did not provide all of the missing information requested by the County for the FDP application and described the information that was still missing. The Notice also informed Plaintiffs that the County had determined that all of Tax Lot 4400 is located below the BFE and within the regulatory floodway. Plaintiffs did not agree with the County's determination that the entire site is below the BFE and thus within the regulatory floodway. Instead, Plaintiffs asserted that the location of the proposed single family residence was above the BFE, even if portions of Tax Lot 4400 were below the BFE. The Notice informed Plaintiffs that to resolve this dispute Plaintiffs may file a Letter of Map Amendment ("LOMA") with the Federal Emergency Management Agency ("FEMA") to remove from the floodplain/regulatory floodway the specific portion of Tax Lot 4400 that Plaintiff's contend is above the BFE; the County added that it would "agree with FEMA's determination of BFE across the site." *Id*. On December 2, 2009, County employee Gary Hewitt provided O'Connor with a LOMA form. Third Am. Compl. ¶ 33.

Hanschka was the County employee who determined that all of Tax Lot 4400 was below BFE, within the regulatory floodway, and required an FDP. He made this determination by reviewing the FIRMs, reading the surveyor's information provided by O'Connor, and determining that based on the location of the proposed residence on the surveyor's map, the residence was below the BFE. County Ex. 1[8] at 3 (Hanschka Depo Tr. 210:9-211:17).

Shortly thereafter, O'Connor submitted the LOMA application to FEMA. O'Connor Decl. ¶ 25. One requirement necessary for the LOMA application to be processed by FEMA was a "Community Acknowledgement Form" ("CAF") that had to be signed by Clackamas County.

---

[8] The Clackamas County Defendants submitted exhibits attached to their memorandum of law. These exhibits are referred to as "County Ex." Plaintiffs have not objected to the authenticity of these exhibits, notwithstanding the County's failure to provide any authenticating declaration.

Declaration of Steve Hanschka ("Hanschka Decl.") ¶ 8. The CAF requires, among other things, that the governmental body certify that no "fill" has been placed on the property that is proposed to be removed from the floodway. *Id*. Hanschka determined that the revetment constituted "fill" as referred to in the CAF and conferred with FEMA as to the correctness of this interpretation; FEMA affirmed Hanschka's interpretation and informed him that he could not strike the "no fill" certification and sign the form; thus, Hanschka refused to sign the CAF. *Id.* ¶¶ 9-12. O'Connor repeatedly asked Hanschka to sign the CAF, and Hanschka consistently refused. O'Connor Decl. ¶ 27. Without a signed CAF, however, FEMA would not process O'Connor's LOMA application.

On May 14, 2010, FEMA sent a letter to O'Connor responding to his LOMA application. This letter stated:

> Our review of the technical data prepared by Dan Gilbert,[9] Surveyor, revealed the described metes and bounds area requested for removal from the SFHA is located below the Base Flood Elevation (BFE) of 1118.4 feet (NAVD88) for the location shown on Flood Insurance Rate Panel (FIRM) Number 41005C0382D, dated June 17, 2008.
>
> Further, the subject property is fully located within the regulatory floodway for Sandy River. Consequently, a community acknowledgement form is required to be completed by Clackamas County and submitted with the application package.
>
> Because the area requested to be removed is located in the floodway, and Clackamas County, Oregon has not completed Part B of the Community Acknowledgement Form, the case is considered incomplete. A formal denial letter will not be issued.

County Ex. 2 (footnote added).

---

[9] Dan Gilbert is the surveyor hired by O'Connor to support Plaintiffs' assertion that the proposed residence on Tax Lot 4400 is above the BFE.

### 3.   The FDP hearing, the County's decision, and Plaintiffs' response

On February 3, 2010, Benthin issued a Notice of Hearing to Plaintiffs and neighboring

property owners of Tax Lots 4100 and 4500 for alleged violations, including Plaintiffs' rip-rap

wall. Griffin Decl. Ex. 51. Dkt. 115-29.[10] Plaintiffs asked that the code violation hearing be

postponed due to the extension on the FDP application and until the processing of the LOMA

application had been completed. Benthin opposed the requested extension, and the County

denied Plaintiffs' requested postponement. Third Am. Compl. ¶ 41.

The code violation hearing took place on February 23, 2010. According to Plaintiffs,

Hanschka admitted at the hearing that all of the requested information for the FDP had been

submitted by Plaintiffs, the hearings officer ruled that the FDP application was deemed complete

as of December 2, 2009, and Hanschka agreed he would treat the FDP application as complete.

O'Connor Decl. ¶¶ 29-30. O'Connor and Konell state that they heard Mench ask the hearings

officer immediately after the conclusion of the proceeding on February 23 words to the effect of

---

[10] Plaintiffs argue that the purpose of this hearing was solely to determine whether Plaintiffs' FDP application was complete. Plfs Resp. Br. at 14-15. This argument is unsubstantiated, however, because the only evidence is O'Connor's conclusory assertion in his objections to the Continuing Order issued after the hearing and in O'Connor's declaration filed in opposition to the summary judgment motions. The Court disregards these conclusory statements because they are inconsistent with the evidence in the record and the allegations in the Third Amended Complaint. The Third Amended Complaint alleges that the subject of the hearing was whether Plaintiffs had removed vegetation and constructed the rip-rap wall without approval. Third Am. Compl. ¶ 43. The record shows that the hearing involved allegations against not only Plaintiffs, but also the owners of Tax Lots 4100 and 4500 (all of the alleged violations were consolidated into one hearing because they involved substantially related and similar facts and issues), there were numerous witnesses at the hearing, there was significant evidence entered into the hearing record, and the hearing officer later issued extensive and detailed findings and conclusions relating to much more than simply whether Plaintiffs' FDP application was complete, which the hearing officer noted were consistent with the order given orally at the conclusion of the hearing. The Court also observes that although Plaintiffs provided the Court with the Notice of Hearing, Plaintiffs failed to attach the evidence most relevant to this question, namely the complaint that accompanied the Notice of Hearing sent to Plaintiffs; that complaint detailed the anticipated subject matter of the hearing. *See* Dkt. 115-29.

"Is that all you are going to do?" Rohlf Decl. Ex. A (O'Connor Depo Tr. 155:17-156:6). Dkt. 93-1. Rohlf Decl. Ex. B (Konell Depo Tr. 105:23-106:12, 107:7-19). Dkt. 93-2. Mench states that he approached the hearings officer after the hearing, the hearings officer informed Mench that he would not discuss the case, and Mench then introduced himself to the hearings officer and offered to show him around the Mt. Hood area. Mench Decl. ¶ 11 (Dkt. 20); Rohlf Decl. Ex. C (Mench Depo Tr. 43:10-16, 54:1-3). Dkt. 93-3.

On March 17, 2010, the hearings officer issued a "Continuing Order." Rohlf Decl. Ex. F. Dkt. 93-6. The Continuing Order contained detailed findings of fact, including findings relating to the rip-rap wall, the emergency authorization, the permit applications, the surveys, related photographs, and the many communications between O'Connor and County employees. *Id*. at 2-10, ¶¶ 1-32. The Continuing Order stated that Hanschka had advised Plaintiffs that the entire site was within the regulatory floodway. *Id*. at 7, ¶ 20. The Continuing Order also stated that O'Connor disputed the County's finding that the properties were in "the floodplain" and that the hearings officer disagreed with O'Connor's position; the hearings officer concluded that the entire site was within the "protected and regulated floodplain."[11] *Id*. at 13.

The Continuing Order required that Plaintiffs either remove the rip-rap wall or obtain the necessary FDP, and refrain from future work without obtaining advance approval. *Id*. at 16. The Continuing Order further stated that the hearings officer would consider recommendations from the respondents (including Plaintiffs) and the County in assessing penalties. *Id*. The Continuing

---

[11] The record reflects some inconsistencies in how the parties referenced the regulated area subject to ZDO 703.07, with the parties variously referring to the below-BFE property area as the "regulatory floodway," "regulated floodway," "floodway," and "regulated floodplain." It appears that the parties were referencing the same property status; the "regulatory floodway" or "floodway" as defined in ZDO 703.05(U). The FMD, for which an FDP is required, encompasses more than just property within the regulated floodway. The categorical ban on development contained in ZDO 703.07, however, applies only to the regulatory floodway.

Order expressly allowed the respondents to submit directly to the hearings officer within seven days comments on the Continuing Order and to submit a written response to any post-hearing status report sent by the County. *Id.* at 16-17. O'Connor timely emailed the hearings officer such a response, objecting to the findings and conclusions in the Continuing Order. Griffin Decl. Ex. 38. Dkt. 115-22.

On May 19, 2010, the County denied Plaintiffs' application for the FPD. Griffin Decl. Ex. 8. Dkts. 125-126. The denial concluded that the entire property of Tax Lot 4400 is in the "floodplain and the regulatory floodway" and that a single family residence could not be developed under the ZDOs. *Id.* at 2-3, 7, 13. The denial noted that the rip-rap wall and road improvements are potentially allowable under the ZDOs, if they meet certain criteria. *Id.* at 3, 7. The County concluded, however, that the rip-rap wall and the road improvements did not meet the necessary requirements, failing to conform with, among other things, the requirements of the emergency authorization (for the rip-rap wall) and the ZDOs. *See id.* at 15-19, 22-25.

On June 1, 2010, Plaintiffs appealed the denial of their FDP, requested a continuance of their appeal on July 21, 2010, and then filed a mandamus action in Clackamas County Circuit Court on July 29, 2010, seeking an order requiring the County to issue the FDP. *See O'Connor v. Clackamas County*, Case No. 10070670, Letter Opinion dated June 1, 2012, at 1. County Ex. 4. Dkt. 88-4. On several occasions in July 2010, O'Connor requested a copy of the audio recording of the February 23, 2010 hearing, but was told that none was available because the recording was lost or the equipment had malfunctioned. O'Connor Decl. ¶ 35.

Almost on year later, on June 1, 2011, pursuant to Clackamas County's request, the Continuing Order was vacated and a new hearing requested because the "absence of an audio recording of the February 23, 2010, hearing would thwart potential judicial review of that

PAGE 15 – OPINION AND ORDER

hearing, the March 17, 2010, Continuing Order, and any final order issued pursuant to the [County's] original complaint." Third Am. Compl. ¶ 69 (quoting the June 1, 2011 Order); *see also* O'Connor Decl. ¶ 43. On June 13, 2011, Benthin issued a new Notice of Hearing. Third Am. Compl. ¶ 70. Shortly thereafter, the County dismissed the code violation for the rip-rap wall, without prejudice. Third Am. Compl. ¶ 70; O'Connor Decl. ¶ 43.

On October 27, 2011, Plaintiffs filed the current lawsuit in this Court. On June 1, 2012, the Clackamas County Circuit Court granted summary judgment in favor of Clackamas County against O'Connor's claims in the mandamus proceeding. County Ex. 4.

**D. Additional Adverse Actions and Protected Conduct Alleged by Plaintiff**

On September 9, 2009, Benthin notified Plaintiffs that they were illegally operating a construction business on residential property, referring to the Salmon River Road Property. Third Am. Compl. at ¶ 26.

On October 27, 2009, Benthin mailed citations to Plaintiffs for failure to complete the application for the FPD permit, even though the statutory deadline of February 13, 2010, to complete the application was still almost four months away. Griffin Decl. Ex. 22. Dkt. 115-17. The citation imposed a "forfeiture" of $100 and "threatened penalties" of $3,500 for each of the Relton Lane Lots. *Id*. Although Plaintiffs believed the citations to be baseless because the deadline for completing the applications had not yet passed, Plaintiffs paid the forfeitures, totaling $300. Third Am. Compl. ¶ 27.

On November 14, 2009, O'Connor testified as an expert witness in a civil case in Clackamas County Circuit Court. O'Connor stated that Clackamas County was inefficient in taking care of flooding problems and had allowed the construction of an improper revetment in the Sandy River that caused the loss of the residence owned by the plaintiffs for whom he was testifying. O'Connor Decl. ¶ 20.

PAGE 16 – OPINION AND ORDER

In March 2010, Benthin received a citizen complaint that she believes came from Mench, regarding two hot tubs along the Sandy River that may be in violation of the ZDOs. *See* Griffin Decl. Ex. 23 (Benthin Depo Tr. 97:16-23, 104:3-10). Dkt. 117. The properties were owned by Lifestyle, and on March 30, 2010, Benthin sent code violation allegation letters to Lifestyle relating to those hot tubs. After sending the letters, Benthin was contacted by someone, discussed the issue with Hanschka, realized that the hot tubs were not in violation, and closed the violations. *Id*. (Benthin Depo Tr. 102:4-105:4).

On April 14, 2010, Benthin notified a Big Mountain client that an art studio that Big Mountain had constructed for that client in 2005, and which had been inspected and approved by County building officials at the time, was illegal. At the time of Benthin's action, Big Mountain was constructing a sauna for this client. Benthin testified that she did not know at the time she issued the citation who had originally constructed the art studio or who was constructing the sauna (erroneously referred to as a "hot tub" by Benthin). *Id*. (Benthin Depo Tr. 102:4-105:4).

In December 2010 and March 2011, Benthin issued code violations or code violation allegation letters to three property owners for work performed by Big Mountain and issued two citations to Plaintiffs for engaging in commercial activity on the Salmon River Road Property. O'Connor Decl. ¶ 45; Third Am. Compl. ¶¶ 63-67.

In May, June, July, and September 2011, O'Connor published articles critical of Clackamas County. Griffin Supp. Decl. Ex. 1. In September 2011, Benthin notified homeowners of a possible code violation for failing to obtain a permit for work being done by Big Mountain.

## DISCUSSION

Plaintiffs allege three claims under 42 U.S.C. § 1983: (1) all Defendants violated Plaintiffs' substantive due process rights with respect to the permits for Tax Lot 4400 and the citations issued against the Salmon River Road Property; (2) all Defendants violated Plaintiffs'

PAGE 17 – OPINION AND ORDER

procedural due process rights with respect to the permits for Tax Lot 4400 and citations issued against the Salmon River Road Property; and (3) the County Defendants retaliated against Plaintiffs' exercise of their First Amendment rights. Both the County Defendants and Defendant Mench move for summary judgment against Plaintiffs' claims.

The Court finds that Plaintiffs fail to meet their burden of establishing a material issue of fact that Plaintiffs had a constitutionally protected property interest in the permits sought by Plaintiffs relating to Tax Lot 4400, which is a threshold requirement for a violation of substantive and procedural due process rights.[12] Assuming without deciding that Plaintiffs have a protected property interest in the use and enjoyment of the Salmon River Road Property, the Court finds that Plaintiffs fail to establish a genuine issue with respect to their claims of due process violations regarding this property. Thus, Plaintiffs' due process claims are dismissed.

The Court also finds that Plaintiffs fail to establish a genuine issue sufficient to show a prima facie case of First Amendment retaliation for certain allegations and fail to show the requisite causal connection between conduct allegedly protected by the First Amendment and the decisions made by the County Defendants for other allegations. Thus, Plaintiffs' First Amendment retaliation claim is dismissed.

Finally, the Court finds that Plaintiffs' claims against Mench should be dismissed for the additional reason that Plaintiffs fail to establish a geninue dispute on whether Mench acted under color of law or jointly with Clackamas County. Thus, the Court grants summary judgment on all of Plaintiffs' claims against Mench.

---

[12] Plaintiffs allege constitutionally protected property interests and do not allege any constitutionally protected liberty interest. Thus, no due process liberty issues are presented in this action.

## A.  The County Defendants' Collateral Estoppel and Jurisdictional Arguments

The Clackamas County Defendants argue that the Clackamas County Circuit Court's June 1, 2012 Letter Opinion finds that the FDP application submitted by Plaintiffs was void as a matter of law as of February 8, 2010, and that this decision is binding on this Court. The Clackamas County Defendants further argue that because the FDP was void as a matter of law, there can be no constitutional violation relating to the permitting process or any of Plaintiffs' other claims. The Clackamas County Defendants also argue that this Court does not have jurisdiction to hear this case because it is, essentially, an appeal of the Clackamas County Circuit Court decision and appeals of state court decisions must be heard by the state appellate courts and then only by the United States Supreme Court. The Clackamas County Defendants' arguments are unavailing.

### 1.  This action is not an appeal of the state court decision

Plaintiffs are not seeking in this Court an appeal of the Clackamas County Circuit Court's decision denying mandamus and denying the remedy sought in that action—the issuance of the FDP. Plaintiffs are currently pursuing an appeal with the Oregon Court of Appeals on that issue. In the case before this federal court, Plaintiffs allege violations of their constitutional rights and seek money damages. The state court action focused on one issue—whether the FDP must be issued under state law. This federal action, on the other hand, involves different allegations and claims, including that Defendants violated Plaintiffs' constitutional rights in the manner in which Defendants considered and eventually denied the FDP, the manner in which they considered and eventually approved with conditions the PRCA permit, and in issuing allegedly meritless citations unrelated to the permits and concerning different properties. Notably, the Clackamas County Circuit Court could have granted the mandamus petition and required Clackamas County to issue the FDP, and Plaintiffs still would have had the right to file a Section 1983 claim if their

constitutional rights had been violated in the permitting process. *See, e.g., Carpinteria Valley Farms, Ltd. v. Cnty. of Santa Barbara*, 344 F.3d 822, 830 (9th Cir. 2003) ("Even if the County relented today and issued all of the permits Nesbitt has applied for, he still would have been injured by the treatment he allegedly received and which caused him harm (*e.g.*, retaliation for exercising his First Amendment rights and restricting him from playing polo on his property for nine years while waiting for a major conditional use permit)."). Thus, this lawsuit is not an appeal of the state court's decision, and the state court action does not deprive this Court of jurisdiction.

### 2. The state court ruling regarding the FDP is not dispositive on the issues of this case

The Clackamas County Defendants argue that because the state court determined that the FDP application was void on February 8, 2010, no claims for constitutional violations can survive. Assuming that the state court made such a determination and that this Court is bound by that determination, such a determination does not resolve all of the issues in this case.[13]

---

[13] The Court is not persuaded that the state court made such a definitive finding. In addressing Clackamas County's argument in state court that O'Connor's FDP application was incomplete and thus void on February 8, 2010, the state court found that there was an issue of fact as to whether the application was incomplete and denied summary judgment on that ground. *O'Connor v. Clackamas County*, Case No. 10070670, Letter Opinion dated June 1, 2012, at 1. County Ex. 4. The Court also expressly stated, "As discussed previously, this Court believes a factual issue exists regarding whether the application was factually complete on December 2, 2009." *Id*. at 5. In analyzing the argument as to whether the mandamus was filed prematurely, however, the state court noted that O'Connor's indication that he would provide more information on his application "would operate to prevent the application from being 'deemed complete'" and that the "application would have become void on February 8, 2010. . . ." *Id.* The state court then found, in the alternative, that if the application were deemed complete as a matter of law, O'Connor's conduct served to extend the County's time for performance beyond the 150 days. *Id*. at 5-6.

First, this lawsuit involves more than the FDP application. For example, Plaintiffs allege First Amendment retaliation for actions having nothing to do with the FDP or Tax Lot 4400. They also allege due process violations relating to the PRCA permit, which was issued.

Second, with respect to the FDP application, Plaintiffs allege that the Clackamas County Defendants violated Plaintiffs' constitutional rights in the manner in which the Clackamas County Defendants required the FDP application, reviewed the FDP application, demanded allegedly unnecessary information to process the FDP application, and issued citations that the FDP application was incomplete before the statutory completion deadline had passed. Such allegations relating to the FDP permitting process do not necessarily rise or fall on whether the FDP was ultimately denied, granted, or deemed void. *See, e.g., Carpinteria*, 344 F.3d at 830.

Thus, contrary to the County Defendants' arguments, the state court mandamus proceeding does not serve as a bar to this lawsuit or have a preclusive effect such that it requires this Court to dismiss of all of Plaintiffs' claims.

**B.  Plaintiffs' Due Process Claims**

Plaintiffs allege that Defendants violated Plaintiffs' substantive and procedural due process rights with regard to the use and enjoyment of the Salmon River Road Property and the development of Tax Lot 4400. Plaintiffs fail to show a genuine issue of material fact with respect to any of their due process claims.

### 1. Due process claims relating to the Salmon River Road Property[14]

Plaintiffs allege violations of due process based on the Clackamas County Defendants'
alleged "issuance of meritless citations relating to the Salmon River property" and that they were
harmed because they had to defend against those meritless citations and were thus denied the
"full use and benefit" of the Salmon River Road Property. Third Am. Compl. ¶¶ 82-83, 93. The
facts relating to the Salmon River Road Property are that on or about September 9, 2009,
Defendant Benthin informed Plaintiffs that she thought they were illegally operating a
construction business at the Salmon River Road Property and that on December 14, 2010 and
March 22, 2011, Benthin issued code violations to Plaintiffs for unlawful business activity on the
Salmon River Road Property. Third Am. Compl. ¶¶ 32, 63, 66.

Plaintiffs allege that they were denied the "full use and benefit" of the Salmon River
Road Property, but there is no evidence in the record that any Defendant stopped Plaintiffs from
constructing the residence on the Salmon River Road Property, denied a permit relating to the
Salmon River Road Property, or otherwise deprived Plaintiffs of any "use or enjoyment" of the
Salmon River Road Property. At most, the record shows that Plaintiffs received two code
violations that Plaintiffs consider inappropriate. Plaintiffs were provided notice of those two
code violations. At oral argument, Plaintiffs conceded that a hearing was held on the first code
violation, at which Plaintiffs prevailed, and that the second code violation was dismissed before a
hearing was held. "Notice and a meaningful opportunity to be heard are hallmarks of procedural
due process." *Ludwig v. Astrue*, 681 F.3d 1047, 1053 (9th Cir. 2012) (quotation marks and

---

[14] The County Defendants offer no argument or evidence relating to the alleged due
process violations concerning the Salmon River Road Property. For purposes of the pending
motions, the Court, without deciding, assumes as true Plaintiffs' allegations that they had a
constitutionally protected property interest in the Salmon River Road Property, which is a
necessary threshold showing for either a procedural or a substantive due process claim. *See
Gerhart v. Lake Cnty., Mont.*, 637 F.3d 1013, 1019 (9th Cir. 2011).

alterations omitted) (quoting *Guenther v. Comm'r*, 889 F.2d 882, 884 (9th Cir. 1989)). Because the evidence shows that Plaintiffs received both notice and a meaningful opportunity to be heard, Plaintiffs fail to show a disputed issue of material fact that the issuance of the two code violations rise to the level of a violation of procedural due process.

For their substantive due process claim relating to the Salmon River Road Property, Plaintiffs must show that the two code violations failed to advance any legitimate governmental purpose. *Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir. 2008). When discretionary executive action such as permitting or issuing code violations is at issue, "only egregious official conduct can be said to be arbitrary in the constitutional sense: it must amount to an abuse of power lacking any reasonable justification in the service of a legitimate governmental objective." *Id*. (quotations and citations omitted). Plaintiffs have an "exceedingly high burden" to show that Defendants "behaved in a constitutionally arbitrary fashion." *Id*. (quotation marks omitted) (quoting *Matsuda v. City & County of Honolulu*, 512 F.3d 1148, 1156 (9th Cir. 2008)). Plaintiffs offer only conclusory statements that the two code violations were unfounded, arbitrary, and capricious. Plaintiffs do not offer evidence that the citations for asserted commercial activity on a residential property do not advance any legitimate governmental purpose. Thus, Plaintiffs fail to meet their exceedingly high burden to show that the two code violations on the Salmon River Road Property rose the level of "egregious official conduct." *Id.*; *see also Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1237-38 (9th Cir. 1994) (rejecting substantive due process claim when plaintiff "merely assert[ed]" that decision was arbitrary and pretextual without providing any evidence).

In summary, Plaintiffs fail to present a genuine issue of material fact that their substantive or procedural due process rights were violated with respect to their claims relating to the Salmon River Road Property.

### 2. Due process claims relating to Tax Lot 4400

Plaintiffs allege that all Defendants violated Plaintiffs' substantive and procedural due process rights by failing to issue permits and thus preventing Plaintiffs from developing Tax Lot 4400. To succeed on either a substantive or a procedural due process claim, Plaintiffs must first demonstrate that they were deprived of a constitutionally protected property interest. *Gerhart v. Lake Cnty., Mont.,* 637 F.3d 1013, 1019 (9th Cir. 2011).

Plaintiffs claim that they have a constitutionally protected property interest in the FDP and PRCA permits for which they applied relating to the development of Tax Lot 4400. Plfs. Resp. Br. at 27; *see also* Third Am. Compl. ¶ 75. There are narrow circumstances under which a person may have a constitutionally protected property interest in a permit. *See Gerhart*, 637 F.3d at 1019. As explained by the Ninth Circuit:

> To have a property interest in a government benefit, "a person clearly must have more than an abstract need or desire for [the benefit]. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of *entitlement* to it." [*Bd. of Regents of State Colls. v. Roth,* 408 U.S. 564, 577 (1972)] (emphasis added). Furthermore, a property interest must "stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id.*
>
> Along the same lines, we have held that state law creates a "legitimate claim of entitlement" when it "imposes significant limitations on the discretion of the decision maker." [*Braswell v. Shoreline Fire Dept.*, 622 F.3d 1099, 1102 (9th Cir. 2010)] (internal quotation marks and alterations omitted). For example, we have held that such an entitlement to a government permit exists when a state law or regulation requires that the permit be issued once certain requirements are satisfied. *See, e.g.,* [*Groten v. California,* 251 F.3d 844, 850 (9th Cir. 2001)] (holding that a

> protected property right to a license existed where both federal and
> state law entitled the applicant to a license whenever certain
> statutory requirements were met); *Bateson v. Geisse,* 857 F.2d
> 1300, 1303 (9th Cir. 1988) (holding that a builder had a property
> interest in a building permit where city regulations provided that
> once an applicant met certain requirements, a permit must be
> issued).

*Gerhart*, 637 F.3d at 1019-20 (emphasis and parentheticals in original, bracketed information

added). Here, the governing ZDOs provide discretion to Clackamas County to issue and to place

conditions on the issuance of the FDP and PRCA permits. The ZDOs do not require that a permit

be issued whenever certain statutory requirements are met, but instead grant discretion to

Clackamas County and the Planning Director.

Plaintiffs argue that two distinct constitutionally protected property interests in Tax

Lot 4400 were violated—the first is the interest in a PRCA permit to develop a single family

residence in what Plaintiffs refer to as the "footprint" of Tax Lot 4400, and the second is the

interest in an FDP for the revetment. Plfs. Resp. Br. at 28-31. Plaintiffs argue that they had a

protected property interest in the right to construct a single family residence on Lot 4400 because

the portion of Lot 4400 on which the single family residence was to be placed was not within the

regulated floodway and, as such, no FDP was required to develop that portion of Tax Lot 4400.

Plfs. Resp. Br. at 28-29. Plaintiffs argue that only a PRCA permit was required for the proposed

single family residence on Tax Lot 4400 and that by requiring an FDP, the County Defendants

violated Plaintiffs protected interest in the PRCA permit. Plfs. Resp. Br. at 28-29.

### a.   Requiring an FDP for the single family residence on Tax Lot 4400 was not improper

Plaintiffs fail to show a genuine issue of fact that no FDP was required for the proposed

single family residence on Tax Lot 4400. First, Plaintiffs concede in their Third Amended

PAGE 25 – OPINION AND ORDER

Complaint that Tax Lot 4400 is within a regulated floodplain and that an FDP is required for most development within a regulated floodplain. Third Am. Compl. ¶ 12.

Second, FDP permits are required for development in the FMD and the FMD is applied to the SFHA. *See* ZDOs 703.09 (FDP permit requirement); 703.04 (FMD is applied to the SFHA). Hanschka had the authority to determine the boundaries of the SFHA, including, without limitation, instances where there appears to be a conflict between a mapped boundary and actual field conditions. *See* ZDO 703.04(B) (Planning Director has authority to determine the boundaries of the SFHA). Plaintiffs contend that the proposed residence on Tax Lot 4400 was above BFE and thus outside the regulated floodway. Plaintiffs submitted to the County information from a surveyor that, Plaintiffs argue, supports their interpretation of the floodway boundaries. Hanschka, however, determined from reviewing the FIRM and Plaintiffs' surveyor's information that the residence and the revetment were both in the regulated floodway. Hanschka has the authority to make that determination under ZDO 703.04(B).[15]

Hanschka notified Plaintiffs that if they believe that the County's interpretation of the FIRMs is incorrect and that the portion of Tax Lot 4400 on which the proposed residence was to be developed is above the BFE, Plaintiffs should seek to have that portion of Tax Lot 4400 removed from the SFHA by FEMA. Griffin Decl. Ex. 24. Dkt. 115-18. This removal would be accomplished by amending the relevant FIRM through a LOMA. Hanschka also notified Plaintiffs that if FEMA determined the proposed residence was above the BFE, Clackamas

---

[15] Under ZDO 703.04(B), the Planning Director is authorized to make interpretations regarding the boundaries of the SFHA. During the relevant time period, Defendant Hanschka was the Clackamas County Floodplain Manager and Mike McAllister was the Planning Director. Plaintiffs conceded at oral argument that Hanschka had the necessary authority under the ZDOs to make determinations relating to floodplain management. Thus, this Court treats the determination of Hanschka relating to Plaintiffs' FDP application as the decision of the Planning Director for purposes of ZDO 703.

County would accept FEMA's determination. *Id.* Plaintiffs characterize this as improperly requiring a LOMA to issue the FDP, in violation of the ZDO. The Court disagrees. Hanschka determined that the proposed development was within the SFHA (despite Plaintiffs' argument to the contrary), and he has the authority under the ZDOs to determine the boundaries of the SFHA. After determining the proposed residence was within the SFHA based on his interpretation of the FIRMs, Hanschka had discretion to act in any number of ways, including to deny the FDP or, as he did in this case, offer the option of a LOMA or agree to accept FEMA's interpretation of the BFE.

Plaintiffs submitted the LOMA application and related information to FEMA, asking FEMA to remove the location of the proposed residence from the SFHA. After reviewing the information from O'Connor's surveyor, FEMA concluded that the "area requested for removal from the SFHA is located below the Base Flood Elevation (BFE). . . . Further, the subject property is fully located within the regulatory floodway for Sandy River." County Ex. 2. Dkt. 88-2. Thus, FEMA concurred with Hanschka's conclusion that the location of the proposed residence on Tax Lot 4400 is below the BFE and within the regulated floodway.

The Clackamas County Circuit Court of Oregon reached the same conclusion in granting summary judgment to Clackamas County in the mandamus proceeding brought by O'Connor. The Clackamas County Circuit Court stated:

> The County also asserts that the writ must be dismissed pursuant to ORS 215.429(5) because the grant of the writ would violate substantive law. The County asserts that the undisputed fact is that the property in question currently lies entirely within the regulatory floodway as established by FEMA. Upon review of the record before the Court and considering the arguments of the parties, this Court is inclined to agree.

> [O'Connor] attempts to defend against dismissal by asserting that the property is not in-fact within the floodplain. [O'Connor]

> provides a wealth of factual evidence that the property should not
> be classified as within the regulatory floodway. However,
> [O'Connor] provides no evidence and makes no argument that
> FEMA's classification has in-fact changed. [O'Connor] conceded
> at oral argument that a LOMA permit signed by the County [sic]
> was the proper method to determine this issue.
>
> As such, this Court finds that a grant of mandamus in the case at
> bar would violate substantive law. Summary Judgment on the
> County's third claim of relief is GRANTED.

*O'Connor v. Clackamas County*, Case No. 10070670, Letter Opinion dated June 1, 2012, at 6.

County Ex. 4. The hearings officer also reached the same conclusion in the Continuing Order.

Rohlf Decl. Ex. F at 13. Dkt. 93-6.

The Court finds that Plaintiffs fail to establish that there is a genuine issue that the proposed residence on Tax Lot 4400 is located outside of the regulated floodway.[16] Because the proposed residence on Tax Lot 4400 is within the regulated floodway, Plaintiffs fail to establish a genuine issue on whether it was improper for Clackamas County to require an FDP for the single family residence.[17] To the contrary, ZDO 703 mandates that any development within the

---

[16] The County Defendants argued at oral argument that the finding by the Clackamas County Circuit Court that Tax Lot 4400 is within the regulated floodway has a preclusive effect in the pending motions before this Court. Plaintiffs extensively briefed arguments why the state court opinion does not have a preclusive effect in this Court. Because this Court reaches the same conclusion as the Clackamas County Circuit Court, for judicial efficiency it does not address the issue of whether the state court opinion has preclusive effect.

[17] Plaintiffs also argue that the fact that a PCRA permit was issued in January 2013 on Tax Lot 4200 without the requirement of an FDP supports Plaintiffs' contention that the FDP requirement was improper for Tax Lot 4400. Plaintiffs provide no argument or evidence, however, that the proposed residences on Tax Lot 4200 and Tax Lot 4400 are similarly situated in the SFHA such that they are both subject to an FDP, nor that the issuance of a PCRA permit without an express condition requiring an FDP negates a landowner's obligation to obtain an FDP if the proposed development is within the SFHA. Further, even if Plaintiffs' argument that no FDP was required for the single family residence on Tax Lot 4400 and only a PCRA permit was required were to prevail, as discussed below, Plaintiffs have no protected property interest in that PCRA permit and thus cannot base a claim for alleged violations of constitutional due process on Defendants' actions relating to that permit.

FMD, which includes the regulated floodway, requires an FDP; thus an FDP was required for the single family residence. The Court will therefore consider whether Plaintiffs have a protected property interest in the FDP (for the single family residence or the revetment) or in the PRCA.

### b. Plaintiffs have no constitutionally protected property interest in the FDP

Section 703 of the ZDO governs FDPs. Development in the floodway is generally prohibited, with a few narrow exceptions that require an FDP. ZDO 703.07. One such exception is the construction of rip-rap or other structural stream bank protection measures. ZDO 703.07(B). Section 703 grants broad discretion to the Planning Director and Clackamas County in assessing and approving FDPs. Critical to the constitutional analysis, the ZDO establishes that the "Planning Director *may* approve an FDP" if the applicant provides certain information. ZDO 703.09(C) (emphasis added). The Planning Director must consider certain factors in considering an FDP application, but may also consider any "[o]ther factors that are relevant to the purpose of this section." ZDO 703.09(B)(12). The County also "*may* attach conditions of approval to an FDP if such conditions are deemed necessary to further the purpose of [Section 703]." ZDO 703.09(D) (emphasis added). Further, in reviewing an FDP, the Planning Director "*may* approve a variance from the requirements" of Section 703 under certain circumstances. ZDO 703.13(A) (emphasis added).

The ZDO also grants the Planning Director additional discretionary authority. For example, as noted above, the Planning Director is authorized to make interpretations concerning the boundaries of the SFHA. ZDO 703.04(B). The Planning Director also has the discretion to require applicants to submit an elevation certificate to assist the Planning Director in making this determination. *Id*. The Planning Director *may* also obtain, review, and consider more detailed base flood elevation or floodway data from a federal, state, or other authoritative source. ZDO 703.08(B).

PAGE 29 – OPINION AND ORDER

For Plaintiffs to have the requisite "legitimate claim of entitlement" to the FDP, the governing state law must impose "significant limitations on the discretion of the decision maker." *Braswell,* 622 F.3d at 1102 (quotation marks and alterations omitted). In the permitting context, constitutionally protected property interests have been found where the governing state law requires the permitting authority to issue the permit once the statutory requirements have been met. *See Gerhart*, 637 F.3d at 1019-20; *Bateson*, 857 F.2d at 1303. Conversely, where the governing law allows discretion in approving or denying permits or allows the decision-making body discretion to define or add criteria, no constitutionally protected property interest is created. *See, e.g., Doyle v. City of Medford*, 606 F.3d 667, 673 (9th Cir. 2010) ("'Only if the governing statute compels a result upon compliance with certain criteria, *none of which involves the exercise of discretion by the reviewing body*, does it create a constitutionally protected property interest.' Thus, a statute does not create a property right if it allows the decision-making body discretion to add an additional criterion or to define its own criteria." (quoting *Shanks*, 540 F.3d at 1091) (alteration and citations omitted)); *Thornton v. City of St. Helens*, 425 F.3d 1158, 1164 (9th Cir. 2005) ("[A] statute that grants the reviewing body unfettered discretion to approve or deny an application does not create a property right.").

Here, the governing ZDOs do not compel Clackamas County or the Planning Director to an issue FDP. To the contrary, under the ZDOs, the Planning Director is expressly granted discretion as to whether to approve or deny an FDP, even when the enumerated "approval criteria" requirements of Section 703(C) have been met. ZDO 703.09(C). Further, Clackamas County may require additional criteria in approving FDPs, ZDO 703.09(D), and may consider any additional factors in reviewing the application that the Planning Director deems, in his or her discretion, to be relevant. ZDO 703.09(B)(12). Thus, the ZDOs do not create a constitutionally

protected property interest in FDPs and Plaintiffs do not have a constitutionally protected property interest in the FDP for either the revetment or the single family residence. *See Shanks*, 540 F.3d at 1091 (finding no constitutionally protected property interest in approval of the permits at issue because there was no "statutory language that imposes particularized standards that significantly constrains [the municipality's] discretion to issue the permits in question and would create a protected property interest in the permits' denial" and because the ordinance did not "*mandate* any outcome"); *see also Doyle*, 606 F.3d at 673 (finding that a statute that allows the decision-making body discretion to add criteria or define its own criteria does not create a property right).

Plaintiffs argue that regardless of the County's discretion in evaluating FDP applications, Plaintiffs have a "legitimate claim of entitlement" to the FDP for the revetment because they received emergency authorization to construct the revetment. In January 2009, the Sandy River flooded, damaging the Relton Lane Lots. On February 2, 2009, Plaintiffs obtained emergency authorization to construct the revetment to protect the bank of the Sandy River. Griffin Decl., Ex. 5. Dkt. 115-4. It is undisputed that the revetment requires an FDP. Emergency work is, however, permitted under Section 703 prior to obtaining an FDP, "provided that an FDP is obtained after the emergency has passed." ZDO 703.09. Plaintiffs argue that because they received the emergency authorization to construct the revetment and Clackamas County did not object to the emergency authorization at the time it was approved, Clackamas County was required to issue Plaintiffs an FDP for the revetment and, therefore, created a protected property interest in the permit. Plfs. Resp. Br. at 36-39. Plaintiffs' argument is without merit.

The ZDOs expressly require that an FDP must be obtained even after emergency authorization is received. As noted above, approval of FDPs are at the discretion of the Planning

Director and the County, and there is nothing in the ZDOs stating that the issuance of an emergency authorization affects that discretion. To the contrary, if the emergency authorization mandates the issuance of the FDP, it would essentially negate the requirement that an FDP be issued in addition to the emergency authorization. Also, there is no statutory language requiring the issuance of an FDP simply because an emergency authorization is granted.

Further, the emergency authorization itself states that "[i]n addition, you should contact your city or county planning office to be sure your project is in compliance with local land use plans and programs." Griffin Decl. Ex. 5, at 4. Dkt. 115-4. The emergency authorization by its own terms did not suspend the local land use laws relating to the revetment, but instead instructed Plaintiffs to be sure the revetment conforms with local land use requirements. Plaintiffs were still required to comply with local land use laws in order to obtain an FDP, and the discretion of the Clackamas County Defendants in approving the FDP was not abrogated by the emergency authorization. Thus, the fact that Plaintiffs obtained an emergency authorization to construct the revetment before applying for the FDP does not create a constitutionally protected property interest in the FDP for the revetment.

### c. Plaintiffs have no constitutionally protected property interest in the PRCA permit

Similar to the governing language used in Section 703 for FDPs, the governing language used in Section 704 for PRCA permits does not "*mandate* any outcome" and does not contain any "statutory language that imposes particularized standards that significantly constrain [Clackamas County's] discretion." *Shanks*, 540 F.3d at 1091 (quotation marks omitted) (discussing the statutory language required to create a constitutionally protected property interest in a building permit).

After establishing standards for river and stream setbacks, ZDOs 704.04 and 704.05, the ZDOs then provide discretion for Clackamas County relating to the setback criteria, stating that "[i]n addition to the exemptions listed in Subsection 704.05(A), the minimum setback standards of Section 704 may be modified for purposes consistent with the adopted Economic, Social, Environmental, and Energy analyses for the applicable watershed." ZDO 704.05(B). In light of this discretion, Section 704 does not create a constitutionally protected property right. *See Doyle*, 606 F.3d at 673.

Further, after establishing additional visibility and vegetation standards and permit application requirements, ZDO 704.06-08, the ZDOs state that development activities controlled by Section 704 "shall be reviewed by the Planning and Zoning Division staff to ensure consistency with Section 704." ZDO 704.09. There is no language requiring the Planning and Zoning Division staff to approve permits that meet the standards set forth in Sections 704.04 and 704.06-08. There is also no language restricting the discretion of Clackamas County relating to PRCA permits. Thus, Plaintiffs do not have a constitutionally protected property interest in the PRCA permit.

Because Plaintiffs fail to show they have a constitutionally protected property interest in the development of Tax Lot 4400 through a PRCA permit or an FDP, or that they have a constitutionally protected property interest in the FDP for the revetment, Plaintiffs' claims that their substantive and due process rights were violated fail.[18]

---

[18] Because the due process claims are dismissed on these grounds, the Court does not reach the other arguments raised by the County Defendants.

## C. Plaintiffs' First Amendment Retaliation Claim

### 1. Legal standard

"To recover under § 1983 for [First Amendment] retaliation, a plaintiff must prove:

(1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse

action by the defendant that would chill a person of ordinary firmness from continuing to engage

in the protected activity; and (3) there was a substantial causal relationship between the

constitutionally protected activity and the adverse action."[19] *Blair v. Bethel Sch. Dist*., 608 F.3d

540, 543 (9th Cir. 2010) (footnote omitted). The key criterion in this test is often the causal

relationship, which requires that a plaintiff show that the alleged retaliation was a "substantial or

motivating factor" in a decision of the defendants adverse to the plaintiff. *CarePartners LLC v.

Lashway,* 545 F.3d 867, 877 (9th Cir. 2008) ("A plaintiff alleging retaliation for the exercise of

constitutionally protected rights must initially show that the protected conduct was a substantial

or motivating factor in the defendant's decision.") (quotation marks and citation omitted). A

plaintiff may establish that retaliatory intent was a "substantial" or "motivating" factor through

circumstantial evidence, which requires that the plaintiff (1) prove that the official engaging in

the alleged retaliatory acts knew of the plaintiff's protected conduct, and (2) "(i) establish

proximity in time between [the plaintiff's] expressive conduct and the allegedly retaliatory

actions; (ii) produce evidence that the defendants expressed opposition to [the plaintiff's] speech,

---

[19] Evaluation of federal employer-employee cases includes the additional requirement
that the protected expression be of public importance and allows for the application of a
balancing test. *See CarePartners LLC v. Lashway,* 545 F.3d 867, 880 (9th Cir. 2008) ("Analysis
of a government employee's speech-based retaliation claim is similar to speech-based retaliation
claims by regulated entities . . . but adds two additional criteria."); *David Hill Dev., LLC v. City
of Forest Grove*, 688 F. Supp. 2d 1193, 1212-13 (D. Or. 2010) (discussing the different
analytical frameworks and that the employee-employer framework adds "that the speech be
related to a matter of public concern and the *Pickering* balancing test"). These additional criteria
are not at issue in this case, which does not involve a federal employee-employer dispute.

either to [the plaintiff] or to others; or (iii) demonstrate that the defendants' proffered explanations for their adverse actions were false and pretextual." *Alpha Energy Savers, Inc. v. Hansen,* 381 F.3d 917, 929 (9th Cir. 2004).

The Court issued a Minute Order in this case setting forth the standard for evaluating whether the alleged protected conduct in this case was a substantial or motivating factor in the Clackamas County Defendants' decisions, as is required to support a First Amendment retaliation claim. Dkt. 136. The Court allowed the parties the opportunity to submit additional briefing on this issue. *Id*. The Clackamas County Defendants dispute the standard set out by the Court in the Minute Order.

The Clackamas County Defendants argue that the applicable standard for a First Amendment retaliation claim in the context of a private citizen suing a government entity is set forth in *Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012), that *Lacey* requires this Court to analyze "but-for" causation, that there is no requirement that the protected conduct be a substantial or motivating factor, and that this Court should not consider the analytical framework discussed by the Ninth Circuit Court of Appeals in assessing alleged violations of the First Amendment against regulated entities as set forth in *CarePartners*.

As an initial matter, the relationship between Plaintiffs and the Clackamas County Defendants is the type of relationship governed by *CarePartners*—Plaintiffs' land use requests are regulated by Clackamas County and Plaintiffs sought a permit from Clackamas County. *See, e.g., David Hill Dev., LLC v. City of Forest Grove*, 688 F. Supp. 2d 1193, 1212-13 (D. Or. 2010) (applying *CarePartners* analytical framework because, among other reasons, the plaintiff "sought permission from Defendants to develop its property, i.e., the relationship between the

PAGE 35 – OPINION AND ORDER

parties was governed by the permitting process"). Additionally, the Clackamas County

Defendants misread *Lacey*. That case is consistent with *CarePartners* and expressly states:

> We have held that to demonstrate a First Amendment violation, a
> plaintiff must provide evidence showing that by his actions the
> defendant deterred or chilled the plaintiff's political speech and
> such deterrence *was a substantial or motivating factor* in the
> defendant's conduct.

*Lacey*, 693 F.3d at 916 (alterations, quotations, and citation omitted) (emphasis added). Thus,

contrary to the assertion of the Clackamas County Defendants, *Lacey* does not eliminate the

"substantial or motivating factor" prima facie causal requirement. *Lacey* does discuss "but-for"

causation, *id.* at 917, but as noted below, the "but-for" causation element is included in the

framework set forth in *CarePartners* (and by the United States Supreme Court).

The Clackamas County Defendants also misunderstand this Court's application of the

three factors discussed in *Alpha Energy* relating to how a plaintiff may prove retaliatory motive.

*Alpha Energy* is a case involving First Amendment retaliation claims by a federal employee, for

which the analytical test requires two additional elements besides those required in cases such as

this one. *See supra* p. 32, n.19. *Alpha Energy* and other federal employee First Amendment

retaliation cases, however, still require the "substantial or motivating factor" element. *Alpha*

*Energy* explains how plaintiffs may meet that element by proving knowledge plus at least one of

the three types of circumstantial evidence. *Alpha Energy*, 381 F.3d at 929. The consideration of

those three types of circumstantial evidence to show retaliatory animus applies in suits other than

federal employee First Amendment retaliation actions. *See, e.g., McCollum v. Cal. Dept. of Corr.*

*& Rehab.*, 647 F.3d 870, 882 (9th Cir. 2012) (finding in the context of an individual plaintiff

suing the government that circumstantial evidence of First Amendment retaliatory motive

generally requires one of the three types set forth in *Alpha Energy*). Thus, the Court is not

applying the federal employee First Amendment retaliation analytical framework from *Alpha*

*Energy*, but is merely applying the circumstantial evidence standard for the "substantial or motivating factor" requirement that is applicable here.

In this case, to avoid summary judgment Plaintiffs must show that their protected conduct was a substantial or motivating factor in the decisions of the Clackamas County Defendants that were adverse to Plaintiffs. If Plaintiffs meet their initial burden of showing that retaliation was a substantial or motivating factor, the burden then shifts to the County Defendants to establish that they would have made the same decision even in the absence of Plaintiffs' protected conduct. *See CarePartners*, 545 F.3d at 877. This is the step in the analysis that incorporates the "but-for" causation requirement. As the United States Supreme Court explained (in discussing First Amendment retaliation causation in federal employee cases):

> It is clear, moreover, that the causation is understood to be but-for causation, without which the adverse action would not have been taken; we say that upon a prima facie showing of retaliatory harm, the burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of (such as firing the employee). If there is a finding that retaliation was not the but-for cause of the discharge, the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind. It may be dishonorable to act with an unconstitutional motive and perhaps in some instances be unlawful, but action colored by some degree of bad motive does not amount to a constitutional tort if that action would have been taken anyway.

*Hartman v. Moore*, 547 U.S. 250, 260 (2006) (citations omitted). To meet their burden of showing that retaliation was not the but-for cause, the County Defendants must show "by a preponderance of the evidence that [they] *would* have reached the same decision; it is insufficient to show merely that [they] *could* have reached the same decision." *CarePartners,* 545 F.3d at 877.

### 2.  Protected activity

The Court has considered the arguments of the parties and the evidence in the record and finds that the following alleged conduct engaged in by Plaintiffs is protected by the First Amendment's guarantee of free speech or right to petition the government for redress: (1) publishing articles critical of Clackamas County; (2) testifying as an expert witness in court critical of Clackamas County; (3) making public statements during any administrative or court hearing critical of Clackamas County; (4) emailing objections and complaints relating to the Continuing Order; (5) filing an administrative appeal to the FDP denial; and (6) filing the petition for mandamus in Clackamas County Circuit Court. These types of conduct are all protected conduct under the First Amendment. *See CarePartners*, 545 F.3d at 878 (finding that the plaintiff's pursuit of administrative review of the agency's decision and a court stay fell within the First Amendment's protection of the right to petition for a redress of grievances and that the plaintiff's lobbying efforts to acquire a license for a facility, public statements criticizing state employees, and advocacy relating to the plaintiff's interpretation of the building codes were all protected by the plaintiff's right to free speech).

### 3.  Adverse actions

To be an adverse action that rises to the level of providing the basis for a constitutional retaliation claim, the action must be one that would "chill a person of ordinary firmness from continuing to engage in the protected activity." *Blair*, 608 F.3d at 543. Plaintiffs allege many facts, some of which do not rise to the level of First Amendment adverse action, and Plaintiffs do not specify the adverse actions that they allege. Construing Plaintiffs' pleadings, evidence, and arguments liberally, the Court considers the following conduct to be potentially adverse actions that, if done with a retaliatory motive, could potentially chill a person from engaging in protected activity: (1) Benthin's citation on October 26, 2009, that the rip-rap wall was constructed without

a permit, when the permit application period had not yet expired; (2) Hanschka's determination that all of Tax Lot 4400 was within the regulated floodway and that the only method by which Plaintiffs could reverse that determination would be through a LOMA; (3) conditioning the PRCA permit on obtaining an FDP; (4) Hanschka's repeated refusal to sign the CAF, when the LOMA could not be processed by FEMA without that form; (5) the County's denial of the FDP; (6) Benthin's issuance of two code violations against the Salmon River Road Property; and (7) Benthin's issuance of code violations or threatened issuance of code violations on customers of Big Mountain. The Clackamas County Defendants do not dispute that these actions are adverse actions for First Amendment retaliation purposes. Accordingly, the Court assumes without deciding that these actions are adverse all actions under the First Amendment retaliation standard and will analyze the causation requirement for each of them.

### 4.  Causation

Plaintiffs recite many facts and then assert in a conclusory fashion that there is retaliatory animus. Plaintiffs do not, however, discuss which protected conduct allegedly resulted in which adverse action. In analyzing causation, the Court must consider the sequence of events to determine which protected conduct may properly be considered the cause of which adverse action. Plaintiffs rely generally on the circumstantial evidence of proximity between the alleged protected conduct and the alleged adverse actions. As such, Plaintiffs must prove knowledge of the alleged protected conduct and that the alleged adverse action followed "suspiciously" close in time after the alleged protected conduct. *See CarePartners*, 545 F.3d at 878; *Alpha Energy,* 381 F.3d at 929.

A timeline of events and actors is helpful in this analysis and is set forth below. The alleged protected conduct is shown in bold and the alleged adverse actions are shown in italics:

| | |
|---|---|
| January 20, 2009 | Plaintiffs apply to the Oregon Department of State Lands for emergency authorization to construct the revetment on Tax Lots 4200, 4300, and 4400 |
| February 2, 2009 | Plaintiffs receive approval for the emergency revetment |
| April 30, 2009 | Plaintiffs complete work on the emergency revetment |
| July 20, 2009 | Benthin sends letter to Plaintiffs notifying them that the rip-rap wall may be a code violation |
| July 29, 2009 | Telephone conference between Benthin and O'Connor in which O'Connor states that he will submit FDP and PRCA permit applications on or before August 3, 2009 |
| July 30, 2009 | Benthin sends letter to O'Connor noting that the construction work on the Relton Lane Lots violated ZDO 703 and 704 and that FDP and PRCA permit applications must be submitted by August 20, 2009 |
| August 11, 2009 | O'Connor submits PRCA and FDP permit applications |
| August 17, 2009 | Hanschka notifies Plaintiffs that the FDP application is incomplete and the deadline to complete it is February 13, 2010 |
| August 20, 2009 | O'Connor informs Benthin that he is obtaining survey and engineering information and that under the ZDOs Plaintiffs are entitled to 180 days to complete their FDP and PRCA applications |
| August 26, 2009 | Clackamas County Planning Division notifies Plaintiffs that the PRCA application is incomplete and the deadline to complete it is February 7, 2010 |
| *September 9, 2009* | *Benthin notifies Plaintiffs that Benthin believes Plaintiffs are illegally operating a construction business on the Salmon River Road Property* |
| *October 26, 2009* | *Benthin issues citations to Plaintiffs for constructing the rip-rap wall without an FDP* |
| **November 14, 2009** | **O'Connor testifies as an expert witness in Clackamas County Circuit Court in a civil case in which none of the Clackamas County Defendants were a party, criticizing Clackamas County** |
| December 2, 2009 | O'Connor delivers additional supporting documentation for the PRCA and FDP applications |
| | PRCA permit application is deemed complete |

PAGE 40 – OPINION AND ORDER

|  | *Hanschka issues a notice to Plaintiffs that the recently submitted materials do not complete the FDP application and the application is still incomplete. This notice also informs Plaintiffs that the County has determined that the entire property is within the regulated floodway, Plaintiffs could seek a LOMA from FEMA, and Clackamas County would accept FEMA's determination as to whether the proposed development is in the regulated floodway* |
| *January 12, 2010* | *PRCA permit for single family residence on Tax Lot 4400 is approved with conditions, one of which is that an FDP must be obtained because the property is located within the regulated floodplain* |
| *February 3, 2010* | *Clackamas County issues a Notice of Hearing to Plaintiffs regarding the alleged violations on the Relton Lane Lots* |
| February 12, 2010 | Plaintiffs request a continuance for the violation hearing until FEMA finishes processing the LOMA. *Clackamas County denies the request* |
| *February 16, 2010* | *Hanschka refuses O'Connor's request that Hanschka sign the CAF* |
| **February 23, 2010** | **Plaintiffs participate in the hearing on the Relton Lane Lot violations and dispute the County's conclusions and positions** |
| *March 8, 2010* | *Hanschka again refuses O'Connor's request that Hanschka sign the CAF* |
| March 11, 2010 | Clackamas County deems the FDP application to be complete |
| *March 17, 2010* | *Clackamas County hearings officer issues a "Continuing Order" on the Relton Lane Lot violations* |
| **March 2010** | **O'Connor sends an email to the hearings officer, objecting to the Continuing Order and criticizing its conclusions** |
| Spring/summer 2010 | The Clackamas County Defendants allegedly destroy, alter, or lose the audio recording from the February 23, 2010 hearing |
| *March 30, 2010* | *Hanschka again refuses O'Connor's request that Hanschka sign the CAF* |
|  | *Benthin issues two separate code violations to Lifestyle for homes downriver from Plaintiffs' property for hot tub code violations* |
| *April 14, 2010* | *Benthin notifies the Pepos family that a structure previously constructed by Big Mountain was illegal, issued a violation letter, and allegedly causes delays in permits being sought for new construction on the property being performed by Big Mountain* |

PAGE 41 – OPINION AND ORDER

| | |
|---|---|
| *May 19, 2010* | *Hanschka denies Plaintiffs' FDP request* |
| **June 1, 2010** | **Plaintiffs appeal the denial of the FDP** |
| July 21, 2010 | Plaintiffs request a continuance of their appeal hearing |
| **July 29, 2010** | **Plaintiffs file a mandamus action in Clackamas County Circuit Court, seeking an order requiring the County to issue the FDP** |
| *December 14, 2010* | *Benthin issues a code violation to Plaintiffs for illegally operating a business on the Salmon River Road Property* |
| *December 22, 2010* | *Benthin issues a code violation to Fred Accuardi for his subdivision that Big Mountain had developed* |
| *March 9, 2011* | *Benthin issues another code violation to Fred Accuardi for his subdivision that Big Mountain had developed* |
| *March 22, 2011* | *O'Connor met with building officials who agreed there were no violations relating to the Accuardi subdivision. Benthin nevertheless schedules a hearing* |
| | *Benthin issues another code violation to Plaintiffs for illegally operating a business on the Salmon River Road Property* |
| *May 2011* | *Clackamas County advises William Wright that the repair work to his property performed by Big Mountain is a potential code violation* |
| | **O'Connor publishes two articles criticizing Clackamas County** |
| June 1, 2011 | Clackamas County requests the Continuing Order be vacated and that a new hearing be scheduled because the audio recording of the February 23, 2010 hearing was missing |
| *June 13, 2011* | *Benthin issues a Notice of Hearing for constructing the rip-rap wall without a permit* |
| June 2011 | Clackamas County dismisses the code violation for the rip-rap wall, without prejudice |
| | **O'Connor publishes another article criticizing Clackamas County** |
| **July 2011** | **O'Connor publishes another article criticizing Clackamas County** |

PAGE 42 – OPINION AND ORDER

September 2011        Benthin issues a notice of possible code violation to Terry and George
                     Skorich for failing to obtain a PRCA permit for landscaping work
                     performed by Big Mountain

**September 14, 2011  O'Connor publishes another article criticizing Clackamas County**

As this timeline demonstrates, the Clackamas County Defendants, well before any
alleged protected conduct occurred, made findings that Plaintiffs did not like or agree with. As is
his right, O'Connor attended hearings, disputed the findings of the Clackamas County
Defendants, and appealed those findings administratively and judicially. The Clackamas County
Defendants continued to stand by their initial findings. These facts, however, do not establish a
genuine issue of material fact as to First Amendment retaliatory motive. [20]

Retaliatory motive may be shown when there is a change in a municipality's position
relating to the plaintiff shortly after the plaintiff engages in protected conduct or a negative
decision by a municipality after a plaintiff engages in protected conduct. *See, e.g., Soranno's
Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1315-16 (9th Cir. 1989) (finding an issue of fact on
retaliatory motive where the municipality had suspended the plaintiffs' permits after they
engaged in protected conduct); *David Hill Dev.*, 688 F. Supp. 2d at 1215 (finding an issue of fact

---

[20] At oral argument, the Clackamas County Defendants stated that the County regarded
O'Connor as a "thorn in their side." This statement appears to relate to the County's current
characterization of O'Connor, and not to a characterization from 2009. Even if it were a
characterization from 2009, however, it would not affect the outcome of the pending motions.
Plaintiffs allege no protected conduct before the November 2009 civil court testimony that could
provide the basis of a First Amendment retaliatory motive for the County's considering
O'Connor a "thorn in their side" or for the County's alleged adverse conduct in this case. Nor
could Plaintiffs make such an allegation because there is a two-year statute of limitations for acts
giving rise to a Section 1983 claim. *See Carpinteria*, 344 F.3d at 829 (finding in a First
Amendment retaliation case in the permitting context that discrete acts of alleged conduct, even
if related, are time-barred if outside the applicable statute of limitations). The statute of
limitations for a Section 1983 claim is that of the forum state's personal injury limitations period.
Oregon has a two-year statute of limitations for personal injury claims. Or. Rev. Stat.
§ 12.110(1). Plaintiffs filed this action on October 27, 2011; thus Plaintiffs may only rely on
conduct after October 27, 2009, to support their Section 1983 claims.

PAGE 43 – OPINION AND ORDER

on retaliatory motive where defendants "initially approved but later disapproved of Plaintiff's proposed sewer alignment" and where defendants "did not raise objections to the fifteen-foot temporary utility easement prior to approving the preliminary plat but objected only after Plaintiff first began to speak out about Defendants' allegedly improper handling of the process"). Where a municipality continues to affirm its negative decision that was made before any protected conduct, and there is no new evidence presented by the applicant after the protected conduct that would warrant a change in the municipality's negative decision, there can be no logical inference that retaliatory animus was the cause of the negative decision.

Here, the Clackamas County Defendants were consistent in their interpretations and decisions under the ZDOs, both before and after the alleged protected conduct, including: (1) their determination that all of Tax Lot 4400 was in the regulatory floodway; and (2) their requirement of a LOMA approved by FEMA removing the single family residence from the regulatory floodway or a determination by FEMA that the single family residence was above the BFE before the County would accept that the proposed residence was not within the regulatory floodway. The evidence that Plaintiffs rely on to dispute the determinations made by the Clackamas County Defendants, including the data from Plaintiffs' surveyor, was presented to the Clackamas County Defendants before they initially made those disputed determinations and before Plaintiffs' engaged in protected conduct that was known to the Clackamas County Defednats. Thus, Plaintiffs fail to show an issue of fact that the alleged protected conduct was the requisite cause of the Clackamas County Defendants' actions.

For completeness, the Court next analyzes the possibility of retaliatory animus as the but-for causation with respect to each of the potential specific adverse actions.

PAGE 44 – OPINION AND ORDER

### a. Pre-February 23, 2010 alleged adverse actions

The earliest protected conduct engaged in by Plaintiffs is the November 14, 2009, testimony of O'Connor. Plaintiffs provide no evidence, however, that any of the Clackamas County Defendants even knew about this testimony. Knowledge is a requirement in a First Amendment retaliation claim. *See, e.g., David Hill Dev.*, 688 F. Supp. 2d at 1213 ("To establish retaliatory motive, a plaintiff must prove the defendant had knowledge of the protected conduct, as well as [the three *Alpha Energy* factors].."); *Ordonio v. Cnty. of Santa Clara*, No. C–11–4570 EMC, 2012 WL 1155597, at *5 (N.D. Cal. Apr. 5, 2012) ("Accordingly, the Court finds that Plaintiffs cannot establish a first amendment retaliation claim because the alleged retaliatory acts occurred prior to Defendants' knowledge of any complaints by Plaintiff."); *Marr v. Anderson*, No. 03:06-CV-00354-LRH-RAM, 2008 WL 2037310, at *4 (D. Nev. May 9, 2008) ("[Defendants'] lack of knowledge regarding [Plaintiff's] alleged speech also defeats [Plaintiff's] First Amendment retaliation claim against these defendants.").

The record evidence shows that neither Benthin nor Hanschka knew about O'Connor's testimony. Both Benthin and Hanschka stated under oath that they were unaware of O'Connor's testimony until after this lawsuit was filed. Hanschka Decl. ¶ 4; Benthin Decl. ¶ 3. None of the Clackamas County Defendants were a party to the civil case in which O'Connor testified, and there is no evidence that any of the Clackamas County Defendants attended the trial or heard O'Connor's testimony.

Plaintiffs, however, argue that Hanschka must have known about O'Connor's testimony because the underlying suit involved flooding and Hanschka is "the person responsible for floodplain development in Clackamas County." Plfs. Supp. Br. at 5. This is not sufficient evidence to establish a genuine issue regarding whether Hanschka knew of O'Connor's testimony. To hold otherwise would improperly impute to Hanschka knowledge of all testimony

PAGE 45 – OPINION AND ORDER

in every lawsuit relating to flooding. Plaintiffs similarly argue that Benthin must have known about O'Connor's testimony because she had issued code violations to the plaintiffs in the lawsuit. This, too, is insufficient to show Benthin's knowledge and would also improperly impute to Benthin knowledge of all testimony in every trial in which she had issued a citation to one of the parties. Plaintiffs' proffered inferences simply are not reasonable.

The next alleged instance of protected conduct is Plaintiffs' participation in the February 23, 2010 hearing. Because the earliest alleged protected conduct of which the Clackamas County Defendants had knowledge is the February 23, 2010 hearing, none of the alleged adverse actions that occurred before that hearing could have had a retaliatory motive. This includes the requirement of the LOMA, the requirement of the FDP in the PRCA permit conditions, Benthin's notice to Plaintiffs that she believed Plaintiffs were illegally operating a business on the Salmon River Road Property, and Hanschka's first refusal to sign the CAF. Accordingly, Plaintiffs' First Amendment retaliation claims are dismissed with regard any alleged adverse actions that occurred before February 23, 2010.

### b. March and April 2010 alleged adverse actions

The alleged adverse actions after the February 23, 2010 hearing include Hanschka again refusing to sign the CAF and the hearings officer issuing the "Continuing Order." Plaintiffs fail to show the requisite causation for either of these actions. Hanschka had previously refused to sign the CAF before the protected conduct, and Plaintiffs offer no evidence that he would have changed his mind and agreed to sign the form but for their participation in the hearing (or any other protected conduct). Thus, none of the instances of Hanschka's refusing to sign the CAF may serve as a basis for Plaintiffs' claim of First Amendment retaliation.

As for the Continuing Order, Plaintiffs fail to show that *retaliation* for their participation in a routine hearing, scheduled by Clackamas County and to which Plaintiffs were entitled to

have held and participate in as a matter of law, was a substantial or motivating factor in the

issuance of the Continuing Order, let alone the but-for cause of that Continuing Order. Plaintiffs'

participation in the hearing is insufficient to create a genuine issue of retaliatory animus—

Plaintiffs must offer some evidence from which retaliatory animus can reasonably be inferred.

They have not done so. The evidence offered by Plaintiffs is that they attended the hearing, they

thought it went well, and they were upset by the Continuing Order. This does not give rise to a

reasonable inference of retaliatory motive. If it did, every participant of every administrative

hearing could file a First Amendment retaliation claim if he or she received an unfavorable result

at a hearing. A hearing must be provided a petitioner to ensure due process, and providing such a

hearing cannot automatically generate grounds for a First Amendment retaliation claim if the

petitioner does not prevail.

        Plaintiffs offer no evidence, argument, or legal support for their theory that by

participating in the hearing and receiving a result they did not like, they have created a genuine

issue on their claim of First Amendment retaliation. The mere fact that Plaintiffs did not get the

result they wanted from the hearing is not proof of a First Amendment retaliation claim. *See,*

*e.g., Hamer v. El Dorado Cnty.*, No. CIV 08-2269 MCE EFB PS, 2010 WL 670780, at *6 (E.D.

Cal. Feb. 19, 2010) (noting that "the First Amendment does not impose any affirmative

obligation on the government to respond to the petitions raised by individual citizens, does not

guarantee that citizens' speech will be heard, and does not require that every petition for redress

of grievances be successful" (citing  *Smith v. Ark. State Highway Emps.*, *Local 1315*, 441 U.S.

463, 464–65 (1979), in dismissing First Amendment retaliation claim where plaintiffs were

dissatisfied with the government's conduct, expressed that dissatisfaction to the government, and

alleged that the government retaliated against them by failing to enforce plaintiffs' restraining orders).

Plaintiffs also offer no evidence that their routine participation in the hearing triggered such animus that the result of the hearing was altered specifically to infringe on Plaintiffs' rights. To the contrary, the findings in the Continuing Order are consistent with the County's position all along and with Hanschka's earlier determinations made before any protected conduct (*e.g.*, all of Tax Lot 4400 is within the regulatory floodway). Thus, Plaintiffs do not meet their burden to show a triable issue that the Continuing Order was motivated by retaliatory animus.

In March 2010, O'Connor emailed the hearings officer, objecting to the Continuing Order and criticizing the actions of the Clackamas County Defendants. On March 30, 2010, Benthin sent two violation letters to Lifestyle for hot tub violations, and on April 14, 2010, Benthin issued a violation letter to the Pepos family relating to an existing structure on their property that Big Mountain had constructed. Big Mountain was performing additional construction work on the property at the time of that citation.

Plaintiffs rely on temporal proximity as circumstantial evidence of retaliatory motive. When such proximity is relied upon, the adverse action must be "suspiciously" close in time to the protected conduct. *CarePartners*, 545 F.3d at 878; *see also Schneider v. Amador County*, No. 2:10-cv-2342-GEB-EFB PS, 2013 WL 898054, at *9 (E.D. Cal. Mar. 8, 2013). Retaliation is not, however, established simply by showing adverse activity by the defendant after the exercise of protected conduct; rather, Plaintiffs must show a nexus between the two. *See Huskey v. City of San Jose*, 204 F.3d 893, 899 (9th Cir.2000) (retaliation claim cannot rest on the logical fallacy of *post hoc, ergo propter hoc*, *i.e.*, "after this, therefore because of this").

PAGE 48 – OPINION AND ORDER

For purposes of the pending motions, the protected conduct of objecting to the Continuing Order and the adverse actions of the hot tub and Pepos citations by Benthin are close in time. There is no evidence, however, that Benthin knew of O'Connor's objections. O'Connor sent the objections to the hearings officer, not Benthin, and there is no evidence the hearings officer forwarded the objections to Benthin.

Even if Benthin had knowledge of the protected conduct, with respect to the hot tub citations, the evidence shows that Benthin sent the hot tub violation letters in response to a citizen complaint, she believes from Mench, that the hot tub locations violated the code. *See* Griffin Decl. Ex. 23 (Benthin Depo Tr. 97:13-25; 104:3-10). Dkt. 117. Further, Benthin testified that after internally obtaining more information, the hot tub violations were closed. *Id*. at 104:14-105:4. With respect to the Pepos citation, Plaintiffs provide no evidence that Benthin knew that the existing structure on the property had been constructed by Big Mountain or that Big Mountain was the company doing the ongoing construction at the time she issued the citation. Although the entire deposition testimony concerning this violation was not submitted to the Court, the portion that was submitted shows that Benthin did not know who had constructed the structure or who was performing the current work, and she did not know whether Plaintiffs were involved. *Id*. at 102:4-104:2. Thus, Plaintiffs fail to create an issue of fact concerning whether O'Connor's objections to the Continuing Order were the cause of Benthin's hot tub or Pepos citations.

Plaintiffs also argue that Benthin's citations were issued in retaliation for O'Connor's request to Hanschka on March 30, 2010 that he sign the CAF. Assuming without deciding that this request to Hanschka constitutes protected action, Plaintiffs again offer no evidence of causation. O'Connor spoke with Hanschka, not Benthin, and there is no evidence that Benthin

knew about O'Connor's request to Hanschka that he sign the form. O'Connor had made this same request unsuccessfully on two prior occasions, and Plaintiffs offer no evidence or explanation for why this third request would now trigger the allegedly spurious violation allegation letters.

### c. Denial of the FDP

Plaintiffs allege that the May 19, 2010 denial of Plaintiff's FDP was issued in retaliation for Plaintiffs' protected conduct. Plaintiffs again fail to show a genuine issue regarding causation. First, the protected conduct alleged within any proximity to the FDP denial is Plaintiffs' attending the February 23, 2010 hearing, disputing Hanschka's finding that the Tax Lot 4400 was fully within the regulated floodway, disputing Hanschka's finding that fill had been placed on Tax Lot 4400 and thus serving as the absis for Hanschka's refusal to sign the CAF, and objecting to the Continuing Order that was consistent with Hanschka's findings.

Here, as noted above, the Clackamas County Defendants were consistent in their positions, both before and after the alleged protected conduct. Plaintiffs thus fail to show a triable issue that retaliatory motive was a substantial or motivating factor for the denial of the FDP. Moreover, even if they could make such a showing, the Clackamas County Defendants have met their burden to prove they would have denied the permit even in the absence of the protected conduct. *See Soranno's Gasco*, 874 F.2d at 1314 (finding that if a plaintiff alleging retaliation shows that the protected conduct was a substantial or motivating factor, "the burden shifts to the defendant to establish that it would have reached the same decision even in the absence of the protected conduct" (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977))).

FEMA, the Clackamas County Circuit Court, the hearings officer, and this Court have all found Hanschka's determination that all of Tax Lot 4400 is within the regulated floodway is

PAGE 50 – OPINION AND ORDER

warranted and appropriate. Thus, under the ZDOs, the Clackamas County Defendants were required to deny Plaintiffs' requested FDP for the single family residence. For the revetment, the evidence shows that Hanschka and other County staff consistently maintained that the revetment failed to comply with the ZDOs and thus would have denied the FDP with regard to the revetment regardless of O'Connor's alleged protected conduct. Accordingly, there is no genuine issue that Plaintiffs' protected conduct was the but-for cause of the County's denial of the FDP.

### d. December 2010 through May 2011 alleged adverse actions

Plaintiffs allege adverse actions in December 2010, March 2011, and May 2011, when Benthin issued code violations to other homeowners for work performed by Big Mountain and when Benthin issued two code violations to Plaintiffs for illegally operating a business on the Salmon River Road Property. The protected conduct that is closest in time to these alleged adverse actions is the June 1, 2010 appeal of the FDP denial and the July 29, 2010 filing of the mandamus action in state court relating to the FDP. The alleged adverse actions, however, are not "suspiciously" close in time to the protected conduct to provide the requisite causal connection, coming more than four months after the latest protected conduct. Further, even if they were proximate in time, a genuine issue of causation has not been shown. Benthin originally notified Plaintiffs on September 9, 2009, that she believed that Plaintiffs were illegally operating a business, which was well before any alleged protected conduct, and Plaintiffs offer no evidence that Benthin knew of Plaintiffs' connection to any of the other homeowners or the work done on their property.

### e. June and September 2011 alleged adverse actions

In May 2011, O'Connor published two articles criticizing Clackamas County. On June 13, 2011, Benthin issued a Notice of Hearing on the rip-rap wall being constructed without a permit. Although these events are close in time, there is an intervening event that removes any

PAGE 51 – OPINION AND ORDER

reasonable inference of causation. On June 1, 2011, Clackamas County vacated the Continuing

Order and requested that a new hearing be scheduled because the audio recording of the

February 23, 2010 hearing was missing. In response to that order, Benthin issued a Notice of

Hearing. Thus, to the extent Benthin knew about the May 2011 articles and proximity could

provide circumstantial evidence of causation, the Clackamas County Defendants meet their

burden of showing that the Notice would have been issued regardless of the articles published by

O'Connor. Plaintiffs fail to create a genuine issue to the contrary. Further, merely providing

Plaintiffs with a new hearing and vacating the Continuing Order, with which Plaintiffs

previously disagreed, is not itself an "adverse action" for purposes of First Amendment

retaliation analysis.

O'Connor continued publishing articles critical of the County in June and July 2011. In

September 2011, Benthin issued a notice of possible code violation to Terry and George Skorich

for failing to obtain a PRCA permit for landscaping work performed by Big Mountain. Even if

the timing were considered to be close enough, Plaintiffs fail to provide evidence that Benthin

knew that this landscaping work was performed by Big Mountain.

**D.  Plaintiffs' Claims Against Mench**

Plaintiffs assert the same claims for substantive and procedural due process against

Mench, in his individual capacity, as Plaintiffs assert against the Clackamas County Defendants.

Because the Court finds that Plaintiffs fail to establish an issue of material fact relating to their

procedural and substantive due process claims and dismisses those claims, the claims against

Mench are similarly dismissed. Even if Plaintiffs' due process claims against the Clackamas

County Defendants had survived the Clackamas County Defendants' motion for summary

judgment, the Court would still grant summary judgment in favor of Mench on the two due

process claims asserted by Plaintiffs against him because Plaintiffs fail to establish a genuine dispute concerning whether Mench was acting under the color of state law.

To state a claim for liability under 42 U.S.C. § 1983, "a plaintiff must show both (1) deprivation of a right secured by the Constitution and laws of the United States, and (2) that the deprivation was committed by a person acting under color of state law." *Tsao v. Desert Palace, Inc.*, 698 F.3d 1128, 1138 (9th Cir. 2012) (quotation marks and citation omitted). The requirement under Section 1983 that the challenged conduct be taken "under color of state law" is the same as the "state action" required for conduct to be subject to the Fourteenth Amendment. *See Lugar v. Edmondson Oil Co., Inc.,* 457 U.S. 922, 928-29 (1982). "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) (quotations and citations omitted); *see also Caviness v. Horizon Commun. Learning Center, Inc*., 590 F.3d 806, 812 (9th Cir. 2010).

A private individual may, in rare circumstances, be considered to be acting under the color of state law "if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Assoc.*, 531 U.S. 288, 295 (2001) (quotations and citations omitted); *see also Caviness*, 590 F.3d at 812. What is fairly attributable as state action "is a matter of normative judgment, and the criteria lack rigid simplicity. No one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Brentwood*, 531 U.S. at 295–96.

PAGE 53 – OPINION AND ORDER

In the Ninth Circuit, to determine whether otherwise private conduct may fairly be attributable to the state, courts follow a two-step approach: (1) "the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible"; and (2) "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Florer v. Congregation Pidyon Shevuyim, N.A.*, 639 F.3d 916, 922 (9th Cir. 2011) (quotations and citations omitted). Courts start with the presumption that private conduct does not constitute governmental action. *Id.*; *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999). The plaintiff bears the burden of establishing that the defendants were state actors. *Florer*, 639 F.3d at 922.

With regard to the second prong, which asks whether the party charged with the deprivation may fairly be said to be a state actor, the Ninth Circuit recognizes "at least four different criteria, or tests, used to identify state action: (1) public function; (2) joint action; (3) governmental compulsion or coercion; and (4) governmental nexus." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003) (quotations and citations omitted, bracketed information added). In ruling on Defendants' motions to dismiss, the Court previously held in this case that the only potential bases for finding state action in the circumstances alleged here are governmental nexus (also known as "pervasive entwinement") and joint action. Dkt. 66 at pp. 26-27.

### 1. Governmental nexus

The governmental nexus test is the "most vague of the four approaches." *Id.* at 1094. "[T]he nexus test asks whether 'there is such a close nexus between the State and the challenged action that the seemingly private behavior may be fairly treated as that of the State itself.'" *Id.* at 1094–95 (quoting *Brentwood*, 531 U.S. at 295).

Although Plaintiffs do not expressly concede that the pervasive entwinement test does not apply in this case, Plaintiffs limit their argument to the joint action test. The Court finds that the

PAGE 54 – OPINION AND ORDER

pervasive entwinement test does not apply under the facts of this case. That test requires

"pervasive entwinement to the point of largely overlapping identity" and generally involves

government employees working at a private organization or involved in its day-to-day operations

or a significant financial relationship. *See Kuba v. Sea World, Inc.*, 428 Fed. Appx. 728, 731 (9th

Cir. 2011). For example, pervasive entwinement has been found where "[t]here would be no

recognizable [private actor], legal or tangible, without the public . . . officials, who do not merely

control but overwhelmingly perform all but the purely ministerial acts by which the [private

actor] exists and functions in practical terms." *Brentwood*, 531 U.S. at 300. The record is devoid

of any facts showing this type of pervasive entwinement between Mench and Clackamas County.

### 2.  Joint action

For joint action to be found, there must be willful joint participation between the state and

private actors "where the state was in 'a position of interdependence with the private entity.'"

*Florer*, 639 F.3d at 926 (quoting *Kirtley*, 326 F.3d at 1093). "This occurs when the state

knowingly accepts the benefits derived from unconstitutional behavior." *Kirtley*, 326 F.3d

at 1093. Courts have refused to find joint action where benefits from the private action at issue

flow not to the state but to a non-governmental beneficiary. *See id.* For example, public

defenders, guardians ad litem, and private student loan guarantors implementing a state

educational loan program have all been found not to be state actors because the benefits of their

actions flowed to accused, the minor client, and the student, respectively, and not to the

government. *See, e.g., Polk Cnty. v. Dodson*, 454 U.S. 312, 325 (1981) (public defender);

*Kirtley*, 326 F.3d at 1093 (guardian ad litem); *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d

1480, 1486 (9th Cir. 1995) (student loan guarantor). This is true even though those types of

private actors provide a "public benefit" in the broad sense of that term.

In considering the willful joint participation required for joint action to be found, the

Ninth Circuit of Appeals explains that:

> courts examine whether state officials and private parties have
> acted in concert in effecting a particular deprivation of
> constitutional rights. . . . The test focuses on whether the state has
> so far insinuated itself into a position of interdependence with the
> private actor that it must be recognized as a joint participant in the
> challenged activity. . . . A plaintiff may demonstrate joint action by
> proving the existence of a conspiracy or by showing that the
> private party was a willful participant in joint action with the
> [s]tate or its agents. . . . To be liable as co-conspirators, each
> participant in a conspiracy need not know the exact details of the
> plan, but each participant must at least share the common objective
> of the conspiracy. . . . [A] private defendant must share with the
> public entity the goal of violating a plaintiff's constitutional rights.

*Franklin v. Fox*, 312 F.3d 423, 445 (9th Cir. 2002) (citations and quotations omitted). A

substantial degree of cooperation is required in order to impose civil liability for actions by a

private individual that allegedly impinge on civil rights. *Id*.

### a.  Government interdependence and benefits flowing to the government

Plaintiffs fail to present evidence that Clackamas County "so far insinuated itself into a

position of interdependence with [Mench] that it must be recognized as a joint participant" in any

of the activities of Mench alleged by Plaintiffs, including that Clackamas County "knowingly

accept[ed] the benefits derived from unconstitutional behavior." *Parks Sch.*, 51 F.3d at 1486.

Plaintiffs appear to argue that the unconstitutional activity of Mench from which Clackamas

County benefitted was (1) taking photographs of Plaintiffs' property and providing them to

Hanschka, and (2) having a conversation with the hearings officer after the February 23, 2010

hearing that Plaintiffs characterize as "*ex parte*" and allege influenced the hearings officer's

decision. Plaintiffs, however, fail to show how Clackamas County benefited from these alleged

actions or how these alleged actions violated Plaintiffs' constitutional rights.

The record evidence shows that the conversation that followed the hearing was constitutionally insignificant. Konell and O'Connor both testified that all they heard was Mench asking if that was all the hearings officer was going to do. Mench testified that he introduced himself to the hearings officer, invited him to visit the area, and did not discuss work that was being done by Plaintiffs. In the Continuing Order, the hearings officer certified that "[t]he Compliance Hearings Officer did not receive any written or oral ex parte communications on a fact in issue during the pendency of the proceedings." Rohlf Decl. Ex. F (Continuing Order) at 1. Drawing all reasonable inferences in Plaintiffs' favor, the evidence in the record fails to support the allegation that this conversation violated the constitutional rights of Plaintiffs or that Clackamas County derived a benefit from this conversation.

With regard to the photographs of the revetment and the hot tubs taken by Mench, Plaintiffs fail to show that Clackamas County had so insinuated itself into Mench's life as to make Mench's photography a state act. Plaintiffs make much of their argument that Mench must have trespassed on Plaintiffs' property in order to obtain the photographs, but even if that were true, it is irrelevant for purposes of this analysis. Wrongful private conduct does not serve to convert private action into action under color of state law for Section 1983 purposes. *See Sullivan*, 526 U.S. at 50 (noting that Section 1983 excludes merely private conduct "no matter how discriminatory or wrongful"). The Court must evaluate whether the evidence in the record creates a material issue of fact as to the level of state intrusion into Mench's act of taking and sending photographs such that the act amounted to state action. The record does not support such a conclusion here.

Benthin testified that she does not solicit comments from citizens of Clackamas County, but that citizens sometimes express concern or lodge complaints regarding possible code

violations and that Benthin then independently investigates the citizen complaints. Benthin Decl. ¶¶ 2-4. Dkt. 95. Benthin does not collaborate with citizens in making enforcement decisions, does not rely on citizen photographs, and conducts her own investigation and site visits. *Id*. ¶¶ 4-6.

Hanschka testified that he works with Clackamas County residents to encourage and facilitate public involvement in land use decisions and that most land use applications and decisions include opportunities for public comment. Hanschka Decl. ¶ 2. Dkt. 94. Hanschka considers public input, but does not delegate any decision-making authority. *Id*. ¶ 4. Hanschka received comments and photographs from Mench on Plaintiffs' proposed development, and responded to them in the same manner he responds to all citizen comments. *Id*. ¶ 5. They were given no greater weight than submissions received relating to Plaintiffs' property from other citizens. *Id*. ¶ 7. Hanschka considers Mench's submissions, both relating to Plaintiffs' property and relating to other developments on which Mench has commented, to be typical of submissions from other concerned citizens. *Id*. ¶ 6. Hanschka does not rely solely on information or photographs submitted by citizens, but performs his own investigation, including site visits, and he does not ask citizens to conduct any kind of investigation. *Id*. ¶¶ 8-9.

The evidence also does not support a finding that the photographs by Mench were of any significance or benefit to Clackamas County. The photographs taken of the hot tubs may have triggered a violation letter, but after further investigation the County closed the violations. *See* Griffin Decl. Ex. 23 (Benthin Depo Tr. 104:14-105:4). Dkt. 117. The photographs taken by Mench of the revetment were sent to Clackamas County on March 29, 2010. Griffin Decl. Ex. 33. Dkt. 118. By that time, Clackamas County had already decided that an FDP was required, that a LOMA was required, that the revetment constituted fill and thus Hanschka would

not sign the CAF, and the Continuing Order had been issued with its detailed findings and conclusions. Plaintiffs have not presented evidence showing what benefit the County could have received from Mench's photographs at such a late date or how these photographs enabled the County to perform any of the allegedly improper actions that had already been performed before the photographs were received.

Plaintiffs assert that the statement in the FDP denial that "County photographs" illustrate that rock has been installed by Plaintiffs on a neighboring tax lot must refer to Mench's photographs. Plaintiffs offer nothing beyond speculation to support this contention and ignore the evidence in the record that refutes this contention. The record shows that the County took its own photographs. The FDP denial itself states that County staff took photographs of the road work and vegetation removal on Plaintiffs' property in mid-October 2008, and that this road work included installing rock, gravel, and fill. Griffin Decl. Ex. 8 at 3, 15. Dkts. 125 and 126. Additionally, the Continuing Order (issued March 17, 2010, well before Mench took his photographs), expressly states that Clackamas County staff conducted an on-site inspection and took several photographs of the rip-rap wall. Rohlf Decl. Ex. F (Continuing Order) at 4. Thus, the reference in the FDP denial to "County" photographs showing rock on Plaintiffs' property is to just that—County photographs.

Plaintiffs offer no evidence to support their speculation that Mench and Clackamas County were so interdependent that they can be seen as jointly taking the pictures taken by Mench. To the contrary, the County took their own photographs and made their allegedly adverse decisions well before Mench took his photographs.

### b. Conspiracy

To create a genuine issue regarding conspiracy, Plaintiffs must produce "concrete evidence" of an agreement or "meeting of the minds" between Mench and Clackamas County to

violate the plaintiff's rights. *See Radcliffe v. Rainbow Constr. Co.*, 254 F.3d 772, 783 (9th Cir. 2001); *United Steelworkers of America v. Phelps Dodge Corp.*,865 F.2d 1539, 1540-41 (9th Cir. 1989). Plaintiffs have not done so.

Plaintiffs argue that there was a "meeting of the minds" between Mench and Clackamas County officials to conspire with the mutual goal of depriving Plaintiffs of their constitutional rights. Plfs. Mench Resp. Br. at 7. Plaintiffs assert that a conspiracy is evident because: (1) Mench had a close relationship with the Clackamas County Defendants; (2) Mench received from the Clackamas County Defendants information not generally provided to the public, including several email strings between Clackamas County employees and other governmental agencies; (3) Mench spoke with the hearings officer immediately after the February 23, 2010 hearing and allegedly "influenced" the hearings officer's decision; (4) Mench took photographs of the revetment and sent them to Hanschka; and (5) Mench took photographs of properties on the Sandy River that he believed had hot tubs too close to the river and sent those photographs to Hanschka. *Id*. at 2-7. These conclusory statements and minimal facts, however, are not concrete evidence of a conspiracy and do not meet Plaintiffs' burden to create a genuine issue for trial on the question of whether Mench is a state actor.

As discussed above, the evidence in the record shows that the photographs taken by Mench and the conversation between Mench and the hearings officer were insubstantial interactions. They do not support a finding that Mench was a conspirator with a goal of depriving Plaintiffs' constitutional rights. Mench was exercising his own right of free speech and to petition the government for redress by notifying Clackamas County of what Mench perceived to be possible code violations. This was not unusual for Mench, and his actions with regards to

Plaintiffs' properties were the same as his actions with regards to other properties in the area slated for development. Mench Decl. ¶¶ 6-10.

Further, even if Mench's notification triggered the investigation (which it did not with respect to the Relton Lane Lots because Mench's interactions with Clackamas County with respect to those lots occurred well after the County already had begun investigating Plaintiffs' revetment and proposed single family residence), that is not sufficient to create a genuine issue of conspiracy. The state's prosecution, "even careless or improperly motivated prosecution, is not sufficient to raise a triable issue of conspiracy with [a] citizen complainant. A relationship of cause and effect between the complaint and the prosecution is not sufficient, or every citizen who complained to a prosecutor would find himself in a conspiracy." *Radcliffe*, 254 F.3d at 783. This logic applies equally to citizens who complain to code violation enforcers as it does to citizens who complain to criminal prosecutors. Thus, the fact that Mench provided Clackamas County with photographs of the revetment and photographs of other properties with hot tubs that Mench believed may have been code violations is insufficient evidence to create a genuine issue of conspiracy.

This logic also applies to Mench's conversation with the hearings officer, even if the conversation took place as Plaintiffs allege. Although the Court finds that the evidence does not support Plaintiffs' speculation that Mench attempted to persuade the hearings officer to deny Plaintiffs' application, even if that were true, it still would be insufficient to create a triable issue of conspiracy. This is demonstrated in *Radcliffe* in which a citizen made three different citizen arrests. *Id*. at 778-79. The first two arrests did not result in prosecutions, so after the third arrest the citizen went to the district attorney's office to ask why there had been no previous prosecutions and to notify the prosecutor that another arrest had been made that required

PAGE 61 – OPINION AND ORDER

prosecution. *Id*. at 783. A prosecution was then pursued. *Id*. at 784. The Ninth Circuit in *Radcliffe* found that this evidence was insufficient to create a triable issue of fact as to whether there was a conspiracy between the citizen and the prosecutor. *Id*. Thus, even if Plaintiffs were correct that Mench complained to the hearings officer that more should be done to pursue what Mench considered to be code violations by Plaintiffs, and if the hearings officer then pursued those violations, it still would not support a finding of a conspiracy involving Mench.

The other facts relied on by Plaintiffs as showing a conspiracy are that Hanschka sent three emails to Mench, which included: (1) an October 15, 2009 email forwarding an August 2009 email string between Clackamas County, state agencies, and FEMA relating to the revetment, (Griffin Decl. Ex. 28 at 3-8, Dkt. 115-20); (2) a December 3, 2009 email attaching the Notice of Incomplete Application relating to the FDP (Griffin Decl. Ex. 27, Dkt. 115-19); and (3) a December 17, 2009 email forwarding an email string between Clackamas County and FEMA. (Griffin Decl. Ex. 28 at 1-2, Dkt. 115-20). These communications are not concrete evidence of a meeting of the minds between Clackamas County and Mench to deprive Plaintiffs of their constitutional rights.

Plaintiffs offer only conclusory statements that the type of communications between Mench and Hanschka were unusual and show that Mench had "access and influence [with Clackamas County] that is far beyond the ordinary." Plfs. Mench Resp. Br. at 3-4. "Conclusory allegations unsupported by factual data cannot defeat summary judgment." *Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1078 (9th Cir. 2003).

Further, the communications relied on by Plaintiffs' do not even support Plaintiffs' argument. For example, the December 3, 2009 email attaching the Notice of Incomplete Application states: "Here is the incomplete notice that Kip received and signed in person at the

PAGE 62 – OPINION AND ORDER

counter today. *It has also gone out in the mail today to the other property owners listed on the notice.*" Griffin Decl. Ex. 27. Dkt. 115-19 (emphasis added). Plaintiffs' argument that Hanschka sent this document to Mench as part of their joint conspiracy is belied by the fact that this same document went out to other property owners. *Id*. Further, the evidence in the record shows that it is Clackamas County's common practice to send Notices both to neighboring homeowners and the relevant CPO. *See, e.g.,* Hanschka Decl. ¶ 11;

As for the forwarding of the August email string to Mench in October, it is notable that Mench was not included in the underlying string, was not commenting on the issues, and was not asked for any input or opinion. Mench was merely being forwarded information relating to property development on which he had previously expressed an interest. This evidence does not create a genuine issue about whether Mench was working in concert with the state in deciding the revetment issue. This is also true for the December email—Mench was not involved in the substance of the discussion but was merely provided a copy after-the-fact, and there is no evidence in the record that Mench engaged in any discussion about the content of the email or offered any suggestions about how these issues should be resolved.

Moreover, Hanschka testified that Mench submitted comments regarding many land use proposals, not just Plaintiffs', and that Mench's submissions were not unusual. Hanschka Decl. ¶ 6. Hanschka notes that "many citizens and CPOs" submit information similar to what Mench submitted. *Id*. Hanschka described how he regularly responds to citizen or CPO requests for information by providing that information by email or telephone, including sending copies of documents. *Id*. ¶ 10. Hanschka clarified that he sent documents to MHCCPO in care of Mench, that this was routine County business, and that as a matter of policy Notices of Decision are always sent to the relevant CPO in care of one of its officers (as well as property owners within a

PAGE 63 – OPINION AND ORDER

prescribed amount of feet, among others). *Id*. ¶ 11. The information Hanschka provided to Mench is "typical of the information [Hanschka] would provide in response to any concerned citizen or CPO who makes an inquiry, expresses an opinion, or asks for additional information regarding specific land use action or decision." *Id*. As to Mench's influence, both Benthin and Hanschka testified that they make their decisions independently and based on their own professional judgment. *Id*. ¶ 12; Benthin Decl. ¶ 9.

The only other evidence submitted by Plaintiffs on this issue is the testimony of County employee Gary Hewitt. Mr. Hewitt testified that he does not generally send notices of permit applications to CPOs, among others, until after the applications are complete. Griffin Decl. Ex. 47 (Hewitt Depo Tr. 62:1-19). Dkt. 115-26. When questioned about whether it is improper to send information from an incomplete permit application file to a CPO, Mr. Hewitt responded that it was not improper. *Id*. at 62:20-23. Mr. Hewitt explained that he generally does not send such information to a CPO because "not all the information is there for [the CPO] to review so it would be silly to send an incomplete file to someone to review, just like it is for me to review." *Id*. at 63:2-5. This testimony does not create a genuine issue of a conspiracy between Clackamas County and Mench.

Mr. Hewitt testified that sending information about an incomplete file is not improper. In addition, Mr. Hewitt's testimony does not explain what type of information is typically sent in response to a citizen or CPO inquiry about a particular permit application, but simply addresses the routine scenario of who is sent the notice of a completed permit application and when that notice is sent. No evidence from Mr. Hewitt was submitted relating to how he responds to citizen or CPO inquiries about permit applications and what information he actually provides in response to such inquiries.

PAGE 64 – OPINION AND ORDER

Finally, the notice of incomplete application sent to Mench and others relating to Plaintiffs' FDP application was not a routine notice. One of the issues relating to Plaintiffs' FDP application was whether the permit application itself was complete. The February 23, 2010, hearing, in part, addressed that issue. If the County had waited until the application was complete before sending out a notice to neighboring properties and MHCCPO, those interested parties would not have been able to participate in the February 23, 2010 hearing because Plaintiffs' FDP application was not considered complete before the hearing.

Thus, Plaintiffs fail to rebut the presumption that Mench was not a state actor and fail to provide evidence creating a triable issue as to whether Mench was a state actor.

## CONCLUSION

The Clackamas County Defendants' Motion for Summary Judgment (Dkt. 87) is GRANTED. Defendant Mench's Motion for Summary Judgment (Dkt. 91) is GRANTED. This case is dismissed with prejudice.

**IT IS SO ORDERED**.

DATED this 22nd day of July, 2013.

/s/ Michael H. Simon
Michael H. Simon
United States District Judge

PAGE 65 – OPINION AND ORDER